UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____/

JDC MANAGEMENT, LLC,                                    | Case No.1:08-cv-760

    Plaintiff,                                          | Honorable Paul L. Maloney

        v.

TOM REICH, MICHAEL G. PETERSEN,   and              |                                    |
SCOTT BOWEN, the Commissioner of State Lottery,     |
an officer of the State of Michigan,                |

    Defendants.                                         |

_____

## OPINION AND ORDER

**Denying the Plaintiff's Application for a Preliminary Injunction;**
**Granting the FRCP 12(b)(6) Motion to Dismiss the Complaint for Failure to State a Claim**

**Denying w/o Prejudice as Moot the FRCP 12(b)(1) Motion to Dismiss for Lack of Standing;**
**Terminating and Closing the Case**

### INTRODUCTION

This civil-rights action arises out of the Michigan Lottery Commission ("Commission")'s

denial of temporary charitable-gaming event license applications.  Invoking 42 U.S.C. § 1983, JDC

Management, LLC ("JDC") claims that the Commission violated its constitutional right to the equal

protection of the laws by denying the application of anyone who indicated a plan to hire JDC or

JDC's premises for its event.  Unlike most equal-protection plaintiffs, JDC does not claim to be a

member of a readily-cognizable group, such as a racial or ethnic group.  Instead, JDC necessarily

relies on the "class of one" theory of equal protection recognized in *Village of Willowbrook v. Olech*,

528 U.S. 562 (2000) (p.c.) and refined in *Engquist v. Oregon Dep't of Ag.*, 553 U.S. –, 128 S.Ct. 2146 (2008) (Roberts, C.J.).

The Commission has persuaded the court that there existed a manifestly rational basis for employing this policy of license denials to further a legitimate State interest: protecting the public and the integrity and reputation of charitable gaming in Michigan. *Accord Durham v. Louisiana State Racing Comm'n*, 458 So.2d 1292, 1295 (La. 1984) ("Louisiana has a genuine and legitimate interest in regulating horse racing.") (citing *Barry v. Barchi*, 443 U.S. 55 (1979) (White, J.) (NY statute authorizing summary suspension of harness-racing trainers without a pre-suspension hearing did not violate the Equal Protection or Due Process Clauses)). *Cf. Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 105 (1st Cir. 2002) (affirming dismissal of class-of-one selective-enforcement claim) ("As for appellee's allegedly irrational and arbitrary motivation, Wojcik contends that they made the decision to terminate him in order to protect the 'public perception' of the Lottery. [T]here is simply nothing irrational about acting on that basis. The . . . Lottery depends on a widely held belief that the game is fairly and honestly administered. People will not play the game (and no lottery revenues will be raised) if everyone believes that 'the fix is in.' Thus, when Lottery Commission officials were notified that one of their offices appeared to be rife with scandal and corruption, the responsible officials rationally decided to take swift and visible action to restore the public's confidence.").

It is "'constitutionally irrelevant whether this reasoning" – protecting public confidence in the honesty and regularity of Michigan gaming – "*in fact* underlay the . . . decision,'" *Craigmiles v. Giles*, 312 F.2d 220, 224 (6th Cir. 2002) (quoting *R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1980))) (emphasis added), so long as a rational

basis existed, in theory, for finding that the challenged decision was rationally related to some legitimate governmental interest. *See, e.g., Thurmond v. Block*, 640 F. Supp. 588, 594 (W.D. Tenn. 1986) (Todd, J.) ("[I]t appears to this Court that plausible reasons for the nonprofit requirement of § 2012(I) exist. Because it is constitutionally irrelevant whether this reasoning in fact underlay that requirement, this Court's inquiry need go no further.") (internal citations & quote marks omitted).[1]

**The record conclusively shows a rational basis to believe that a policy of denying all applications listing JDC as operator/lessor for an event furthered the Commission's legitimate interest in protecting the public, protecting charities, and preserving public confidence in the integrity of charitable gaming in Michigan.** JDC is owned by Jennifer Allen, who was married to Mike Allen during the relevant time period (and is, so far as the record reflects, still married to him).[2] The Commission viewed that relationship against the backdrop of Mike Allen's recent

---

[1]

*Cf. Herman v. Lackey*, 309 F. App'x 778, 785 (4th Cir. 2009) (affirming dismissal of equal protection claim filed by teacher of real-estate broker licensure course who objected to action taken by state Commission in response to a complaint filed against him; "Whether Broadway's allegations were true, they nonetheless raised questions about Herman as an instructor and merited review by the Commission. *These serious allegations certainly could raise concerns about the reputation of HSC* [the owner of the real-estate license school], and about Herman's behavior. Because Herman did not negate the hypothetical rational basis, his equal protection claim fails.") (emphasis added).

[2]

Oddly, JDC seems to imply that the Allens might no longer be married or might not remain married in the future, but it does not explain what legal significance these speculative possibilities should have in the case. JDC seems to present these possibilities as an example of something which the Lottery Commission does not know with certainty because it allegedly did not adequately investigate the Allens' relationship to each other and to JDC. *See* JDC Supp Br at 3:

> Lottery has merely assumed that JDC is a sham entity, a front for All-In and/or Mr. Allen. It has done nothing to investigate this erroneous assumption. Nor has it investigated the nature of the marriage between Mr. And Mrs. Allen. For all Lottery knows, the two could be going through a bitter divorce. If they do divorce, would that change Lottery's blacklisting of JDC? What if Mr. Allen's relationship with a paramour was closer than his relationship with Mrs. Allen? Would it then be

history as an operator of charitable-gaming events in Michigan. An investigation of his former company, All-In Entertainment ("All-In"), had revealed evidence that Mike and his employees repeatedly (and sometimes knowingly or intentionally) violated Michigan's Traxler-McCauley-Law-Bowman Bingo Act ("the Bingo Act"), M.C.L. § 432.101 *et seq*., and attendant regulations, in 2006 and 2007. The Commission sent Mike "Notices of Intent to Commence Formal Proceedings" against All-In in October and November 2007, laying out in detail the evidence of the alleged violations, and All-In's counsel met with Commission officials in December 2007. The meeting led to an agreement wherein the Commission refrained from adverse legal or administrative action, in exchange for All-In's voluntary surrender of its Michigan charitable-gaming license. In January 2008, Mike signed the agreement, surrendering All-In's license effective May 31, 2008.[3]

---

permissible for Lottery to blacklist his lover as well?

Notably, JDC does not allege, let alone produce evidence, that the Allens are divorced or going through divorce proceedings.

In any event, Mike Allen's own statements and questions to Commission officials gave them ample reason to suspect he would use his wife and her new company as a front for his surreptitious return to the Michigan charitable gaming business. JDC presents no authority that the Equal Protection Clause somehow required the Commission to investigate even further. It was the Commission's substantial investigation which uncovered Mike Allen's alleged numerous violations. And it was damning testimony "straight from the horse's mouth" which suggested his desire and willingness to stay in the business, through surrogates, despite the nominal surrender of his license. *See, e.g.,* Doc. 26 (Transcript of Mike Allen's meeting with Commission officials) at 9:17-18 (Mike Allen asked whether, if he could not keep his license, his wife could own a location for rental as a charitable-gaming site).

[3]

After surrendering his license, Mike Allen obtained a full-time position as a sales representative for Almond Products, which involves "extensive" travel. *See* JDC Supp Br, Ex 1 (Affidavit of Mike Allen dated March 3, 2009) ¶¶ 1-4. JDC's counsel asserts that Allen's job leaves him "little to no time to run a business or otherwise be involved with JDC even if he wanted to be," JDC Supp Br at 4, but it cites no evidence for this allegation. Review of Mike Allen's affidavit reveals no statement regarding whether he has time to be involved with JDC or other businesses. The affidavit states only that "I am not now, nor was I ever involved with the management or

In addition, the Commission considered Mike Allen's own statements to Commission officials, shortly before the license denials. Significantly, he repeatedly asked the officials whether his wife or other relatives could take over operation of All-In or operate a successor company to do the same charitable-gaming work in Michigan. He indicated his desire to stay involved in the field himself, rather than leaving All-In's costly gaming equipment unused.

Moreover, the timing of certain key events naturally heightened the Commission's suspicion that Mike Allen was using JDC as a way of operating charitable-gaming events in Michigan despite his surrender of his license to operate such events through All-In. Just one month before All-In's license surrender date, Jennifer incorporated JDC, on April 30, 2008. Over the next week, two charitable organizations applied for temporary gaming licenses and listed JDC / Deuces Wild as the intended location of the event. Sixteen days before the surrender, JDC leased the Grand Rapids establishment known as "Deuces Wild", on May 14, 2008. If the licenses had been approved, JDC's first gaming events were scheduled to take place just days after the termination of All-In's license.

**For the reasons that follow, the court will deny JDC's application for a preliminary injunction and dismiss the complaint under FED. R. CIV. P. 12(b)(6) for failure to state a claim.[4]**

**First, the court holds that the "class of one" theory does not apply in this situation,**

---

operations of JDC Management." *Id.* ¶ 5.

[4]

If the court considered constitutional standing, JDC would face a heightened standard. "Claims premised on the government's treatment of a third-party must satisfy stringent constitutional standing requirements." *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) or someone else, much more is needed [to establish causation and redressability].")).

where the Commission had to make a decision that was necessarily "subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. –, 128 S.Ct. 2146 (2008), nominally held only that the class of one theory does not apply to decisions made by government in its role as employer. But its rationale *strongly* suggests that the class-of-one theory is also unavailable in other contexts where government officials must make subjective discretionary decisions, e.g., in its role as a sovereign and regulator.

Sister courts around the country are increasingly taking this view, as in *Crippen v. Town of Hempstead*, 2009 WL 803117 (E.D.N.Y. Mar. 25, 2009), which declared without qualification,

> In addition to the two elements set forth [in *Willowbrook v. Olech*, 528 U.S. 562 (2000)], the Supreme Court recently set forth another requirement for plaintiffs bringing class of one claims. [S]pecifically . . . such plaintiffs must show that the differential treatment received resulted from *non-discretionary* state action.

*Crippen*, 2009 WL 803117 at *4 (emphasis added). *See also Seymour's Boatyard, Inc. v. Town of Huntington*, 2009 WL 1514610 (E.D.N.Y. June 1, 2009) (extending *Engquist* to bar use of the class-of-one theory to challenge town's revocation of license to operate a moor and launch from a town beach); *Tarantino v. City of Hornell*, – F. Supp.2d –, – and n.11, 2009 WL 1384983, *11 & n.11 (W.D.N.Y. May 28, 2009) (extending *Engquist* to bar class-of-one challenge to town code provisions governing rental property, due to the degree of discretion involved); *Upthegrove v. Holm*, 2009 WL 1296969, *1 (W.D. Wis. May 7, 2009) (Crabb, J.) (holding that *Engquist*'s rationale precludes application of class-of-one theory in context of prison employee's decision regarding whether inmate could wear jacket at a particular time); *Bissessur v. Indiana Univ. Bd. of Trustees*, 2008 WL 4274451, *9 (S.D. Ind. Sept. 10, 2008) (extending *Engquist* to bar use of the class-of-one theory to challenge school's decision to expel student); *Siao-Pao v. Connolly*, 564 F. Supp.2d 232,

245 (S.D.N.Y. 2008) (extending *Engquist* to bar class-of-one challenge to parole board's decision to deny parole, because of the necessarily subjective and individualized nature of such decisions); *Harmon v. St. Louis Cty.*, 2009 WL 880024 (E.D. Mo. Mar. 30, 2009) (dismissing claim that county violated equal protection by treating plaintiff worse than others who had been in automobile accidents with a county police officer, stating broadly, "a 'class of one' theory of equal protection is inapplicable in a context that involves discretionary decisionmaking.").[5] [6]

**On this view, JDC's class-of-one equal protection claim is barred as a matter of law, without reference to the facts of record with regard to allegedly similarly-situated entities.** *See Balakrishnan v. Kusel*, 2009 WL 1291755, * 5 (E.D.N.Y. May 8, 2009) (rejecting medical doctor's equal-protection challenge to non-renewal of his license ("CQ") to serve as a laboratory director;

---

[5]

*Cf. Galario v. Adewundmi*, 2009 WL 1227874, *14 (D. Hawaii May 1, 2009) ("Courts have been reluctant, however, to extend such class-of-one cases to situations outside of the regulatory land-use context.").

[6]

Equal-protection plaintiffs have occasionally argued that in the public-employment context (or wherever else *Engquist* might apply), *Engquist* eliminated the class-of-one theory only in cases where the state actor lacked a rational basis for the disparate treatment, but left the theory available in cases where the state actor undertook the disparate treatment in bad faith or with personal animus. A sister court rightly rejected that notion, holding as follows:

> Lewis argues that the *Engquist* decision only eliminated class-of-one claims in employment contexts in which the defendant had no rational basis for the disparate treatment, but did not eliminate class-of-one claims in circumstances in which the defendant acted out of a spiteful or bad[-]faith motive unrelated to a legitimate objective. However, the Supreme Court made no distinction between types of class-of-one cases. * * * In addition, the plaintiff in *Engquist* alleged that the defendant employer acted out of "arbitrary, vindictive, and malicious reasons." [*Engquist*, 128 S.Ct.] at 2147. The Supreme held that she could not proceed on a class-of-one claim based on a bad[-]faith motive theory.

*Lewis v. Binegar*, 2009 WL 1272109, *2 (C.D. Ill. May 6, 2009).

"DOH employees make CQ decisions on a case-by-case basis after evaluating a director's education, experience, and other relevant information, including the results of any DOH investigations into potential regulatory violations. There are no fixed rules defining when these considerations, singly or collectively, require the issuance or denial of a CQ, and therefore their assessment and balancing is inherently discretionary. Because any disparate treatment regarding the withholding of plaintiff's CQ is thus the product of discretionary state action, his 'class of one' claim fails *as a matter of law*.") (emphasis added). Our Circuit has not yet issued a published decision extending *Engquist*'s limitation on the class-of-one doctrine beyond the government-employment context, but logic – and *Engquist*'s reasoning itself – lead the court to conclude that its limitation applies in other contexts as well, including the instant case.[7]

**Second, even if the class-of-one theory were theoretically available, JDC fails to state a claim under the theory on this record.** Whatever the court might have done when confronted with these facts, the Commission clearly had a rational basis for denying applications whenever necessary to prevent JDC (and therefore Mike Allen) from operating or renting premises for a charitable-gaming event.

On the first part of the rational-basis test, JDC does not deny that the State of Michigan has a legitimate interest in protecting the public and charities and preserving the integrity and reputation of gaming, especially charitable gaming. On the second part of the rational-basis test, the Commission convincingly shows that the facts recited above gave it reason to believe that (1) Mike Allen could not be trusted to obey gaming regulations, and (2) Mike and Jennifer Allen could not

---

[7]

The Supreme Court has cited *Engquist* only once so far, in a case that did not involve a class-of-one Equal Protection claim. *See DC v. Heller*, – U.S. –, – n.27, 128 S.Ct. 2783, 2818 n.27 (2008).

be trusted not to have Mike participate in, and profit from, events nominally run by JDC, giving him the opportunity to violate gaming regulations again (and defeating the purpose of inducing him to surrender All-In's license). In other words, denial of the JDC-customer charities' event applications was reasonably tailored to achieving the State's legitimate regulatory interests. Finally, JDC fails to identify anyone who has received an event license, or been allowed to lease premises for an event or operate an event, who is similarly situated to JDC. As confirmed by the parties' post-hearing filings, the individual whom JDC proffers is not similarly situated to JDC under the traditional test, let alone under the stricter version of the test that may apply to class-of-one claims.

## BACKGROUND

The parties agree that Jennifer Allen is married to Mike Allen, the co-owner of All In, and that she worked as receptionist for All-In. *See* Comp ¶ 13; Corrected Affidavit of Jennifer Allen dated June 15, 2008 and filed Sept. 5, 2008 ("Allen Aff") ¶ 12. Jennifer Allen has not challenged the Commissioner's statement that she "signed Group Event Contracts on behalf of All-In Entertainment . . . handled paperwork including filing, keeping track of event date records, player sign-in sheets, answering phones, sending out contracts." *See* Defs.' Opp, Ex 4 - Affidavit of Deputy Commissioner Michael Petersen dated June 20, 2008 ("Petersen Aff") ¶ 23. The Commissioner submits copies of seven Group Event Contracts, dated January through March 2008, which bear the signature and printed name "Jennifer Allen" on behalf of All-In. *See* Defs.' Opp, Ex 5 at 1.[8]

---

[8]*See id.* at 1 (Greater Muskegon Catholic Schools Group Event Contract signed "Jennifer Allen" on March 19, 2008);

This belies JDC's suggestion, at oral argument, that Jennifer Allen had signed "one or two" contracts of All-In. Yet JDC has not challenged the authenticity or accuracy of the documentary evidence that Jennifer in fact signed at least seven contracts for All-In in the first three months of 2008 (leading up to her formation of JDC on April 30). Accordingly, the court accepts the documentary evidence and finds that Jennifer Allen signed at least seven contracts on behalf of All-In. In turn, it was not unreasonable for the Commission to infer from this that Jennifer played a larger role, and exercised greater authority at All-In, than a receptionist, secretary, or clerk typically would.

All-In obtained a Michigan license as a gaming equipment supplier in May 2005. *See* Commissioner's Opp, Ex 4 - Affidavit of Deputy Commissioner of the Michigan Lottery, Michael Petersen, dated June 20, 2008 ("Petersen Aff") ¶ 17. For the period from October 1, 2006 through September 30, 2007, All-In earned about $776,000 from the sale and rental of Millionaire Party equipment and nothing from the sale and rental of bingo equipment. *See* Defs.' Opp, Ex 12 (Supplier Annual Report apparently signed by Mike Allen and dated 10-15-07).

On October 8, 2007, the Michigan Bureau of State Lottery ("the Commission") sent a Notice of Intent to Commence Formal Proceedings to Mike Allen and Shannon McDonough at All-In ("the

_____

*id.* at 2 (Grand Rapids Knights of Columbus, signed "Jennifer Allen" February 22, 2008);

*id.* at 3-4 (Reeths Puffer Athletic Boosters, signed "Jennifer Allen" on January 23, 2008);

*id.* at 5 (Unity Lodge 191, signed "Jennifer Allen" on March 19, 2008);

*id.* at 6 (Michigan Anglers Association, signed "Jennifer Allen" on March 19, 2008);

*id.* at 7 (Reeths Puffer Athletic Boosters, signed "Jennifer Allen" on Feb. 29, 2008);

*id.* at 8 (Greater Muskegon Catholic Schools, signed "Jennifer Allen" on Feb. 22, 2008).

first notice"). The Commission's letter alleged that All-In had violated the Bingo Act, MICH. COMP.

LAWS § 432.101 *et seq*., and attendant administrative rules and regulations, in the following ways:

– failing to remove gaming equipment from rental facilities in Grand Rapids, Muskegon, and Lansing, within two business days after the licensed gaming events, in violation of MICH. ADMIN. R. 432.21805(3), *see* Defendants' Brief in Opposition to Application for a Preliminary Injunction ("Commission's Opp"), Ex 2 at 1;

– having All-In employees participate in and recover winnings in a licensed gaming event on August 18, 2007, in violation of Charitable Gaming Directives 4.03.04 and 4.04.02, *see* Commission's Opp, Ex 2 at 1-2;

– having Mike Allen, an owner of All-In, participate in the leasing of a location called Great Lakes Downs ("GLD") for Millionaire Parties, as evinced by documents dated or conduct occurring between January 20, 2007 and September 18, 2007, in violation of MICH. COMP. LAWS § 432.111b(10) and MICH. ADMIN. R. 432.21811(2), *see* Commission's Opp, Ex 2 at 2-3;

– violating MICH. COMP. LAWS § 432.110 and Charitable Gaming Directive No. 4.04.02 and MICH. ADMIN. R. 432.21811(1), the last of which prohibits "[a] licensed supplier or any owner, shareholder of the privately held corporation, partner, officer, person residing in the same household as a licensed suppler, or agent of a licensed supplier" from being "involved with the management of a licensed gaming event", in the following ways:

having Mike Allen or other All-In employees or agents participate in the management of a Millionaire Party for which All-In provided the gaming equipment, e.g., providing All-In funds as start-up cash for several events in September and November 2006, *see* Commission's Opp, Ex 2 at 4 ¶¶ A & B;

directing the completion, maintenance, and revision of financial records from a Western Michigan Tourist Association event on November 29 - Dec. 2, 2006, *id.* at 4-5 ¶ C;

employing as an agent and paying compensation to an officer of two charitable organizations which applied for Millionaire Party events with All-In as equipment supplier, *id.* at 5 ¶ D;

directing a charitable organization to alter its financial record-keeping, i.e., "not to make a separate deposit" of certain funds "because the state would ask questions that she wouldn't want to answer", *id.* at 5-6 ¶ E;

Mike Allen and apparent All-In employee/agent Dave Durda telling two Michigan

Association for the Deaf and Hard of Hearing employees, in February 2007, that their organization had to provide trophies for its Millionaire Party using All-In equipment, and that it could not have the trophies donated but rather should buy trophies through Durda (All-In), *see id.* at 6 ¶ F;

Mike Allen and Dave Durda pressuring the same two ladies to add three days to their organization's one-day license, and then ending all contact with the organization when it proved unwilling or unable to do so, *see id.*;

Dave Durda telling the Lansing Jaycees that "part of his [All-In's] charges include trophies. These trophies have to be a certain look and style." and making the Lansing Jaycees representative feel that the group had no choice as to whether the trophies were purchased for their millionaire party, *see id.* at 6-7 ¶ G;

having All-In agents "Adam" and Greg Osterhouse handling game chips and cash during an August 2-4, 2007 Caledonia H.S. Millionaire Party, *see id.* at 7 ¶ H;

having All-In agents "Will" and Jon Parker selling game chips on the floor at an August 18, 2007 millionaire party held by the Eaton Rapids Athletic Boosters, *see id.* at 7 ¶ I;

— advertising millionaire parties for which All-In was the equipment supplier, in violation of MICH. COMP. LAWS 432.110(5) and MICH. ADMIN. R. 432.21811(3), *see id.* at 7-8 ¶ A-D.

The sixth and final count of alleged misconduct in the Commission's October 8, 2007 letter was entitled "Honesty and integrity of the licensee," which MICH. ADMIN. R. 432.21802 requires the Commissioner to consider when reviewing a supplier license application or renewal application. *See* Commission's Opp, Ex 2 at 8. Specifically, the Commission charged that All-In violated MICH. COMP. LAWS § 432.110a(d), which provides, "A qualified organization shall not receive more than $15,000.00 in exchange for imitation money or chips in 1 day of a millionaire party." *Id.*

The Commission stated that it had secured affidavits from the Lansing Jaycees July 12-15, 2007 millionaire party coordinator that when he asked All-In agent Greg Osterhouse what to do when the group reached the $15,000 daily limit, Osterhouse responded, "That's up to you, you can shut down or you can sell those." *Id.* at 8-9 ¶ A. When the Lansing Jaycees representative later told

All-In agent Jon Parker that they had reached the $15,000 daily limit, Parker allegedly responded, "You can make a mistake and sell these by accident." and "If you sold them by accident[,] logging the sales would be a mistake." *Id.* at 9 ¶ A. The Commission's letter charged that at an August 27, 2007 Millionaire Party, All-In agent Greg Osterhouse advised the charitable group (Caledonia H.S.) to keep selling chips beyond the MICH. COMP. LAWS § 432.110a(d) $15,000 daily limit but not record the sales. *Id.* at 9 ¶ B.

> The Commissioner's October 8, 2007 letter to All-In concluded,
>
> Since the bureau considers the violations set forth above to be serious, formal administrative action against your license is anticipated. The [Michigan APA] provides for an informal opportunity for your organization to demonstrate compliance. Should you fail to contact our office by *October 22, 2007*, you will be considered to have waived your right to a compliance meeting and we will commence with formal proceedings.
>
> To schedule a compliance meeting at our office . . . , call . . . .

Commissioner's Opp, Ex 2 at 9 (emphasis in original).

On November 21, 2007, the Commission sent another letter to Mike Allen and Shannon McDonough at All-In, again entitled Notice of Intent to Commence Formal Proceedings ("the second Notice"). This letter charged that All-In had again violated MICH. COMP. LAWS § 432.110a(d) by encouraging and directing charitable groups to exceed the $15,000 daily limit at licensed millionaire parties on September 20-23, 2007 (Saint John's Area Skating Association) and July 21, 2007 (Northview Athletic Booster Club). *See* Commissioner's Opp, Ex 2 at 10-11 ¶¶ A & B.

The Second Notice stated that the Commissioner considered this conduct to violate MICH. COMP. LAWS § 432.21804(1) (licensed supplier agrees to obey the Bingo Act and accompanying rules and regulations) and warranted formal administrative action to revoke All-In's charitable-

gaming equipment supplier license. *See id.* at 11. The letter offered an informal compliance meeting if All-In requested one no later than December 5, 2007. *Id.* at 11-12.

On December 11, 2007, All-In's legal counsel attended a compliance meeting with the Commission. *See* Petersen Aff ¶ 19. By letter dated December 21, 2007, the Commission sent All-In a letter stating, in pertinent part,

> Proposed administrative sanctions to resolve the violations specified in the Notice of Intent to Commence Formal Proceedings are contained in the enclosed agreement.
>
> Please sign the appropriate section of the agreement and return it to this office *no later than January 4, 2008.*
>
> In the event that you do not respond within the time provided, this matter will be set for a formal hearing on the issues set forth in the Notice of Intent . . . before an administrative law judge.

Commissioner's Opp, Ex 2 at 13. On January 4, 2008, Mike Allen as "co-owner" of All-In signed an agreement that stated, "To resolve the matter regarding the Notice of Intent to Commence Formal Proceedings dated November 21, 2007 and October 8, 2007, All-In Entertainment agrees, by way of signature, to: Voluntarily surrender supplier license W27300 effective May 30, 2008." Commissioner's Opp, Ex 3; *see also* Petersen Aff ¶¶ 20-21. On about January 31, 2008, the Commission received a letter confirming that All-In had agreed to voluntarily surrender its supplier license. Petersen Aff ¶ 22.

**On April 30, 2008 – about one month before the date on which All-In promised to surrender its gaming-equipment supplier license – Jennifer Allen formed JDC Management, LLC ("JDC"), a single-member Michigan limited-liability company.** *See* Commissioner's Opp, Ex 1 (printout dated Sept. 8, 2008 from website of the Michigan Dep't of Labor & Economic Growth, Bureau of Commercial Services, Corporation Division,

http://www/dleg.state.mi.us/bcs_corp); *see also* Comp ¶ 2.

JDC rents property located at 4148 Lake Michigan Drive in Grand Rapids, Michigan, a property commonly known as "Deuces Wild", under a sub-lease executed on May 14, 2008. *See* JDC's Brief in Support of Motion for Preliminary Injunction ("PI") at 1 (citing Ex. 1); Comp ¶ 9; Allen Aff ¶¶ 1-2; Petersen Aff ¶ 15. JDC's stated business purpose is to "donate gaming equipment to certain charitable organizations for the purpose of conducting fund raisers", which it calls "a relatively common practice in the industry." Allen Aff ¶¶ 4-5; *see also* Comp ¶¶ 10-11.

The parties agree that on May 1 and 6, 2008, respectively, two charitable organizations – the Grand Rapids Jaycees "(the Jaycees") and the Rockford Band Parents ("the Parents") – applied for so-called "Millionaire Party Licenses" (a temporary charitable-gaming license) from the Commission pursuant to the Bingo Act. *See* Commissioner's Opp, Ex 7 (Grand Jaycees application dated May 1, 2008) and Ex 8 (Band Parents application dated May 6, 2008). The Bingo Act provides that

(1)   Each applicant for a license to conduct a bingo, millionaire party, raffle, charity game, or numeral game shall submit to the bureau a written application on a form prescribed by the commissioner.

(2)   The application shall include all of the following:

(a)   The name and address of the applicant organization.

(b)   The name and address of each officer of the applicant organization.

(c)   The location at which the applicant will conduct the event.

(d)   The day or dates of the event.

(e)   The member or members of the applicant organization who will be responsible for the conduct of the event.

(f)   Sufficient facts relating to the applicant's incorporation or

> organization to enable the commissioner to determine whether the applicant is a qualified organization.
>
> (g)     A sworn statement attesting to the nonprofit status of the applicant organization, signed by the principal officer of that organization.
>
> (h)     Other information the commissioner considers necessary.

MICH. COMP. LAWS § 432.104.[9]  The Commissioner does not deny that the Jaycees and the Parents were "qualified organizations" as defined by the Bingo Act, *see* MICH. COMP. LAWS § 432.103(6), and the court so finds.

As required by MICH. COMP. LAWS § 432.104(2)(c), the Jaycees and Parents' applications listed Deuces Wild, 4148 Lake Michigan Drive, Grand Rapids, Michigan as the location of the proposed April 29, 2008 and May 2008 fundraising events, and listed JDC as the lessor of the location.  The Commission denied their applications.  *See* Allen Aff ¶ 8 and Petersen Aff ¶¶ 11-14.  By substantively identical letters dated May 27, 2008, the Commission explained to the applicants:

> The Act at MCL 432.113 provides that the Commissioner shall promulgate rules to implement this Act, including rules for locations of proposed gaming events.  One such rule provides, in relevant part, as follows:
>
>> Rule 109(3): "If the bureau determines that a lessor of a location to be used for the conduct of a special bingo, millionaire party . . . is not in compliance with the requirements of this act, these rules, terms of probation, directives of the bureau, public policy of the State of Michigan, or any other local, state, or federal law or regulation, then the Commissioner may refuse to issue a license to a qualified organization applying to conduct the licensed gaming event at that lessor's facility."

---

[9]

There are 17,722 qualified non-profit local civic, fraternal, religious, educational, senior-citizen and veterans organizations which are eligible for charitable-gaming licensure under the Bingo Act.  *See* Petersen Aff ¶ 6.  In FY 2007, the State of Michigan received 3,179 applications for millionaire-party licenses and approved 2,846, generating over $5 million in profits.  *See id.* ¶¶ 7-8.

Because of the past history of compliance issues involving the lessor and licensed millionaire parties conducted at the location listed on the application [Deuces Wild], the Bureau within its authority under the Act and rules has determined that it is not in the best interest of public policy to issue Millionaire Party licenses to organization who [sic] propose to conduct their event with this lessor or at this location.

Enclosed is a refund check for $200. Judicial review of this decision is provided for . . . .

Commissioner's Opp, Ex 10 and Ex. 11.

While the two organizations' applications were pending, Jennifer Allen contacted the Commission and an unidentified person allegedly told her that "the applications more than likely would be denied because of [her] prior job as the receptionist at All-In and because she was the wife of All-In's owner." Allen Aff ¶ 13-14. Jennifer Allen met with the Commissioner's representatives on May 23, 2008, and she alleges that at the meeting, "Defendants advised me not to bother entering into any more lease agreements to provide a location for Millionaire Parties as no one who was ever associated with All-In would ever get any approval from the Bureau." Allen Aff ¶ 16.

**JDC brings this 42 U.S.C. § 1983 action against Michigan Lottery Commissioner Scott Bowen, Deputy Michigan Lottery Commissioner Tom Reich, and Deputy Michigan Lottery Commissioner Michael Peterson of the Division of Charitable Gaming (collectively "the Commission"), alleging selective enforcement of Michigan state lottery statutes and regulations in violation of JDC's Fourteenth Amendment liberty interest and its Fourteenth Amendment right to procedural due process.**

**JDC seeks a preliminary injunction** ("PI") which requires the Commission to re-evaluate JDC's Millionaire Party License applications for the Jaycees and Band Parents events; enjoins the Commission from "discriminating against JD for Mrs. Allen's previous affiliation with All-In Entertainment or her marriage to its owner"; and enjoins the Commission from selectively enforcing

state lottery regulations. The Commission filed a brief in opposition to the PI and moved to dismiss the complaint under FED. R. CIV. P. 12(b)(6), for failure to state a claim on which relief can be granted. JDC did not file a reply in support of its PI application, and the time to do so has expired.

## LEGAL STANDARD:  PRELIMINARY INJUNCTIVE RELIEF

"The level of proof required for the Plaintiff to obtain a preliminary injunction or TRO 'is much more stringent than the proof required to survive a summary judgment motion.'" *Luckett v. U.S. Bank Nat'l Ass'n*, 2009 WL 22858, *2 (E.D. Mich. Jan. 5, 2009) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).

To obtain preliminary injunctive relief, JDC must show that it is being threatened with a legally cognizable irreparable injury for which there is no adequate legal remedy (such as monetary damages). *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (Thomas, J.)).  When deciding whether to issue a PI, this court considers (1) whether JDC has shown a substantial likelihood that it will prevail on the merits, (2) whether there is a threat of irreparable harm to JDC if the injunction does not issue, (3) whether issuance of the injunction would substantially harm others, and (4) whether issuance of the injunction would serve the public interest.  *Essroc Cement Corp. v. CPRIN, Inc.*, – F. Supp.2d –, –, 2008 WL 5505852, *8 (W.D. Mich. 2008) (Maloney, C.J.) (citing *Hilliard v. Clark*, 2007 WL 2589956, *3 (W.D. Mich. Aug. 31, 2007) (Maloney, J.) (citing *Warshak v. US*, 490 F.3d 455, 465 (6th Cir. 2007))).[10]

---

[10]

    At least two circuits hold that likely success on the merits is a *sine qua non* of injunctive relief.  *See AFGE, AFL-CIO v. US*, 104 F. Supp.2d 58, 64 (D.D.C. 2000); *Wine & Spirits Retailers, Inc. v. RI*, 418 F.3d 36, 46 (1st Cir. 2005) ("The *sine qua non* of this four-part inquiry is likelihood

The failure to show any likelihood of success on the merits – let alone a strong or substantial likelihood of success – is enough, by itself, to warrant denial of preliminary injunctive relief. *See Abbey v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006) ("a finding of no likelihood of success 'is

---

of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become a matter of idle curiosity."). The rationale is that "'[w]ithout such a substantial indication [of likely success on the merits], 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *AFGE*, 104 F. Supp.2d at 64 (quoting *Am. Bankers Ass'n v. NCUA*, 38 F. Supp.2d 114, 141 (D.D.C. 1999) (quoting *WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977))).

*Accord Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 849 n.52 (N.D. Ill. 1987) ("[T]he merits inquiry may be viewed as the most critical. [A] failure on that score is immediately fatal to plaintiff.") (citing *O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 580 (7th Cir. 1981)); *San Miguel v. DPW*, 2008 WL 541150, *5 (S. Ct. Guam Terr. Feb. 20, 2008).

Our Circuit has not yet expressly called the likelihood of success on the merits the *sine qua non* of preliminary injunctive relief. It has held, however, that it was not error to dispense with analysis of the other three factors where the movants made a weak showing on the merits:

> Because the district court found . . . that the plaintiffs did not have a substantial likelihood of success on the merits . . . [it] did not make findings on the record with respect to the remaining three factors to be considered when determining whether a [PI] should issue. Since the district court apparently considered that the failure of the plaintiffs to show a likelihood of success on the merits was significant enough to prevent the injunction from issuing, the additional findings were not necessary. *See generally American Imaging Servs., Inc. v. Eagle-Picher Indus., Inc.* . . . ., 963 F.2d 855, 862 (6th Cir. 1992) (stating that the district court is not required to make findings on factors that are not dispositive with respect to the issuance of a [PI]); 11A [Wright, Miller, and Kane], FEDERAL PRACTICE & PROCEDURE § 2948.3, at 184-188 (2d ed. 1995) (noting that the plaintiff must generally show at least some probability of success on the merits in order to obtain a [PI]).

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (¶ break added). *See also Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) ("[A] district court is not required to make specific findings concerning each of the four factors used [in federal courts] in determining a motion for [PI] if fewer factors are dispositive of the issue."). For a recent summary of all the circuits' standards for preliminary injunctive relief, *see Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363-67 (Fed. Cir. 2008) ("All of the circuits have placed the [PI] in terms of the likelihood of success on the merits and equitable factors. No circuit has held that it suffices simply to raise a 'substantial question.'").

usually fatal'") (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6ᵗʰ Cir 2000));

*see also Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp.2d 962, 967 n.1 (W.D. Mich. 2008)

(Maloney, C.J.) ("Our Circuit has not yet expressly called the likelihood of success on the merits

[a] *sine qua non* of preliminary injunctive relief.  It has held, however, that it [i]s not error to

dispense with analysis of the other three factors where the movants ma[k]e a weak showing on the

merits.") (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6ᵗʰ Cir. 2000) and *Jones v. City of Monroe*,

341 F.3d 474, 476 (6ᵗʰ Cir. 2003)).

## DISCUSSION

**The court holds today that JDC's equal-protection, substantive due process, and procedural due process claims lack merit, so the court must find that it has not shown a likelihood of success on the merits for purposes of preliminary injunctive relief.** JDC's central contention is that the Commission "violated the Fourteenth Amendment's Equal Protection Clause when they selectively enforced the law by denying Millionaire Party Licenses to only those qualified organizations that had contracted with JDC to use its location."  PI at 4-5.

**The United States Supreme Court has "recognized successful equal protection claims brought by a 'class of one,'** where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citing *Allegheny Pittsburgh Coal Co. v. Comm'n of Webster Cty.*, 488 U.S. 336 (1989) and *Sioux City Bridge Co. v. Dakota Cty.*, 260 U.S. 441 (1923)).[11]  As our Circuit recently explained,

_____

[11]

The "class of one" equal-protection theory does not apply when a government employee sues

the Equal Protection Clause "prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County, Ohio*, 430 F.3d 783, 788 (6th Cir. 2005). *Membership in a protected class triggers heightened review,* which is frequently determinative of success on the merits[,] *but it should not be mistaken for a prerequisite to stating a claim in the first place.*

*Franks v. Rubitschun*, 312 F. App'x 764, 765 (6th Cir. 2009) (Merritt, Moore, Cole) (emphasis added) (remanding to the U.S. District Court for the Western District of Michigan).

In *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. –, 128 S.Ct. 2146 (2008), however, the Supreme Court held that the class of one theory does not apply to decisions made by government in its role as employer.[12] But *Engquist*'s rationale strongly suggests that the class-of-one theory is

---

his employer for actions taken in its capacity as employer rather than in its capacity as lawmaker, licensor, or regulator. *Engquist v. Oregon Dep't of Agric.*, – U.S. –, –, 128 S.Ct. 2146, 2148-49 (2008) (Roberts, C.J., for six Justices, with Stevens, Souter, and Ginsburg, JJ., dissenting). *See, e.g.,* citing *Engquist* and dismissing government employee's equal-protection claims on this ground:

> *Majewski v. Luzerne Cty.*, 2009 WL 1683274, *6 (M.D. Pa. June 15, 2009);
> *Ghaly v. Simsarian*, 2009 WL 801636, *12 (D. Conn. Mar. 26, 2009).

[12]

Justice Stevens dissented, joined by Justices Souter and Ginsburg. *See Engquist*, 553 U.S. at –, 128 S.Ct. at 2157-61. The dissenters concluded their opinion as follows:

> Presumably the concern that actually motivates today's decision is fear that governments will be forced to defend against a multitude of "class of one" claims unless the Court wields its meat-axe forthwith. Experience demonstrates, however, that these claims are brought infrequently, [footnote 4: * * * [T]here have been only approximately 150 cases – both in the district courts and in the courts of appeals – addressing such claims since *Olech*.] that the vast majority of such claims are asserted in complaints advancing other claims as well, and that all but a handful are dismissed well in advance of trial. Experience also demonstrates that there are in fact rare cases in which a petty tyrant has misuse governmental power. Proof that such misuse was arbitrary because unsupported by any conceivable rational basis should suffice to establish a violation of the Equal Protection Clause without requiring its victim also to prove that the tyrant was motivated by a particular variety of class-based animus. When the allegations in a complaint fairly identify "the proverbial needle in a haystack," *ante*, at 2157, a federal court should not

also unavailable in other contexts where government officials must make inherently-subjective discretionary decisions, e.g., in its role as a sovereign and regulator. Writing for a 6-3 majority, Justice Chief Justice John Roberts reasoned that *Olech* and the cases on which it relied did not provide a basis for universal or even broad application of the class-of-one theory outside the particular context of those cases. Chief Justice Roberts explained as follows:

> Recognition of the class-of-one theory of equal protection in *Olech* was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle. That case involved the government's regulation of property. Similarly, the cases upon which the Court in *Olech* relied concerned property assessment and taxation schemes. *See Allegheny Pittsburgh, supra* [U.S.]; *Sioux City Bridge, supra* [U.S.]. We expect such legislative or regulatory classifications to apply "without respect to persons," to borrow a phrase from the judicial oath. *See* 28 U.S.C. § 453. * * *

> What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that the zoning board was exercising discretionary authority based on subjective, individualized determinations . . . . Rather, the complaint alleged that the Board consistently required only a 15-foot easement, but subjected Olech to a 33-foot easement. This differential treatment raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it.

> In *Allegheny Pittsburgh*, cited by the *Olech* court, the applicable standard was market value, but the county departed from that standard . . . . Again, there was no suggestion that the "dramatic differences in valuation" for similar property parcels were based on subjective considerations of the sort on which appraisers often rely . . . . *Sioux City Bridge*, also cited in *Olech*, was the same sort of case, recognizing

---

> misconstrue the Constitution in order to make it even easier to dismiss unmeritorious claims.

> In sum, there is no compelling reason to carve arbitrary public-employment decisions out of the well-established category of equal protection violations when the familiar rational review [sic] standard can sufficiently limit these claims to only wholly unjustified employment actions.

*Engquist*, 553 U.S. at –, 128 S.Ct. at 2161 (Stevens, J., dissenting, joined by Souter & Ginsburg, JJ.).

> an equal protection claim when one taxpayer's property was assessed at 100 percent of its value, while all other property was assessed at 55 percent, without regard to articulated differences in the properties.

*Engquist*, 553 U.S. at –, 128 S.Ct. at 2153-54 (other internal citations omitted). The *Engquist* Court did not disturb the holdings or the rationales of *Olech* and its predecessors, because it agreed that a class-of-one claim is generally available to one who alleges that a government discriminated against him by irrationally departing from a clear, objective standard. *See also Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Ed.*, 542 F.3d 529, 539 (6th Cir. 2008) (Martin, Richard Allen Griffin, <u>8th Cir. J. John R. Gibson</u>) (unlike a decision made by a government in its role as employer which allegedly discriminates against the plaintiff's class of one, "Decisions discriminating against identifiable classes of citizens, such as racially discriminatory firings, are more easily judged *against a clear standard* that enables governmental employer and courts alike to distinguish the permissible from the impermissible.") (citing *Engquist*, 553 U.S. at –, 128 S.Ct. at 2153) (emphasis added).

Technically, the Court's *holding* was only that decisions made by the government in its role as employer do not fit *Olech*'s justification for the class-of-one theory. In explaining its rationale, however, the *Engquist* Court used language which can be read to preclude the class-of-one theory *whenever* a government official must make an inherently discretionary decision that involves subjective individual-specific determinations. In fact, it is difficult to read *Engquist* otherwise. Chief Justice Roberts' majority opinion stated a broad rule which necessarily sweeps beyond the government-public context:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that "people should be treated alike , under like circumstances and conditions," is not violated when one person is treated differently than others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the

arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. * * * Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns.

But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision [to complain] that it was subjective and individualized.

*Engquist*, 553 U.S. at –, 128 S.Ct. at 2154. The breadth of *Engquist*'s language militates against the notion that the class-of-one theory is available so long as the plaintiff is not a government employee. Note how the Court described the common thread uniting the government-employee and speeding-ticket situations: both involved plaintiffs misusing the Equal Protection Clause to complain that "a subjective, individualized decision . . . was subjective and individualized." *Engquist*, 553 U.S. at –, 128 S.Ct. at 2154. That is a categorical rejection of class-of-one challenges to subjective, individualized discretionary government decisions, not a rejection peculiar to the government-employment or traffic-enforcement contexts. Right after that, the Court wrote,

This principle applies *most clearly* in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify.

*Engquist*, 553 U.S. at – , 128 S.Ct. at 2154 (emphasis added). The Court chose its language carefully. By saying that the principle (the inapplicability of the class-of-one theory) applies "most clearly" in the employment context, the Court strongly implied that it also applies in other contexts.

**Therefore, the most natural reading of *Engquist* is this: (1) if the plaintiff is a government employee challenging a decision made by a government in its role as employer,**

the class-of-one theory is automatically not available[13], and (2) if the plaintiff instead challenges a decision made by government in some other role (such as sovereign, enforcer of criminal or traffic laws, or regulator), the trial court must determine whether the circumstances fit *Engquist*'s rationale. To comport with *Engquist*'s rationale, the class-of-one theory will not be available if the challenged decision was necessarily subjective and based on an assessment of the plaintiff's personal characteristics (other than *per se* suspect classifications like race and sex).

Both judges on our court and sister courts around the country are starting to take this view. Judge Robert Holmes Bell of our court captured the broad import of *Engquist*: "the Supreme recently has recognized that rational basis scrutiny is not properly applied to employment decisions *and other discretionary decisionmaking*." *Green v. Livingston*, 2009 WL 1788419, *4 (W.D. Mich. June 19, 2009) (going on to quote *Engquist*, 553 U.S. at –, 128 S.Ct. at 2154, and holding that class-of-one theory was not available to challenge parole board's decision whether to

---

13

*See, e.g.,* dismissing government employee's putative class-of-one equal-protection claims with little discussion pursuant to *Engquist*:

*Garner v. City of Cuyahoga Falls*, 311 F. App'x 896, 902 (**6th Cir.** 2009) (Gibbons, McKeague, <u>N.D. Ill. D.J. Shadur</u>) ("Having acknowledged the fatal impact of *Engquist . . .* on his class of one theory, [city employee] Garner proceeds on appeal solely on his claim of . . . .");

*Conyers v. Rossides*, 558 F.3d 137, 151-52 (**2d Cir.** 2009);
*Skiff v. Colchester Sch. Dist.*, 316 F. App'x 83, 84 (2d Cir. 2009);

*Skrutski v. Marut*, 288 F. App'x 803, 809 (**3d Cir.** 2008);

*Lahren v. Univ. & Cmty. Coll. Sys. of Nevada*, 293 F. App'x 546, 547 (**9th Cir.** 2008);

*Kelley v. City of Albuquerque*, 542 F.3d 802, 821-22 (**10th Cir.** 2008);
*Pignatelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1220-22 (10th Cir. 2008);

grant parole); *accord Adams v. Meloy*, 287 F. App'x 531, 534 (7th Cir. 2008) (also holding that class-of-one theory is not available to challenge parole board's decision whether to grant parole; "the parole board's inherent discretion necessitates that some prisoners will receive more favorable treatment than others.").

The Seventh Circuit shares this view that *Engquist*'s rule is not confined to the government-employment context. Judge Tinder, joined by Judges Posner and Cudahy, characterized *Engquist* as holding that "class-of-one equal protection theory is a 'poor fit' where the challenged governmental action is the product of a broadly discretionary decision-making process." *US v. Moore*, 543 F.3d 891, 900 (7th Cir. 2008) (where person claimed that his equal-protection rights were violated because his plea to federal drug charges subjected him to a statutory mandatory minimum sentence which was not imposed on similarly-situated coconspirators who were tried in state court, the class-of-one theory was unavailable, and the coconspirators were not similarly situated anyway).

In *Crippen v. Town of Hempstead*, 2009 WL 803117, *4 (E.D.N.Y. Mar. 25, 2009), the district court stated broadly, "In addition to the two elements set forth [in *Willowbrook v. Olech*, 528 U.S. 562 (2000)], the Supreme Court recently set forth another requirement for plaintiffs bringing class of one claims. [S]pecifically . . . such plaintiffs must show that the differential treatment received resulted from *non-discretionary* state action.") (emphasis added). In other words, whether or not the alleged discrimination occurred in the context of government employment, "[a]llowing class of one Equal Protection challenges in situations where officials exercise discretionary decisionmaking would have the effect of undermining the discretion granted to state officials." *Kahlily v. Francis*, 2008 WL 5244596, *4 (N.D. Ill. Dec. 16, 2008) (holding that class-of-one theory was not available to citizen challenging police officer's discretionary decision to pull him over

despite the absence of any traffic infraction and to refuse to let him turn off his taxi and secure his personal property before taking him to jail).  *See also Flowers v. City of Minneapolis*, 558 F.3d 794, 799-800 (8th Cir. 2009) ("In light of *Engquist*, therefore, we conclude that while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim."), *reh'g & reh'g en banc denied* (8th Cir. Apr. 27, 2009).

The court also finds support in *Robertson v. City of Grand Rapids*, 2008 WL 4822218, *9-10 (W.D. Mich. Nov. 4, 2008), where Magistrate Judge Scoville of our court held that the class-of-one theory was not cognizable in the situation at bar.  The plaintiff in *Robertson* claimed that city police officers and a towing company had targeted him for tickets and related harassment because of personal animus.  Magistrate Judge Scoville properly stated the broad principle that should be drawn from *Engquist*:  "[I]n *Engquist* * * * [t]he Supreme Court held that the 'class-of-one' theory was not appropriate for areas involving discretionary determinations . . . ."  *Id.* at *9.  The Magistrate Judge quoted language from *Engquist* making clear that the Supreme Court did not purport to limit this principle to the facts of that case (a government employee's challenge to a decision made by the government *qua* employer) or to the facts of the example the Court used (a police officer deciding to issue a speeding ticket to one driver, rather than others, on a busy highway where people often drive above the speed limit).  The Magistrate identified the key language:

> "There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.  *In such cases* the rule that people should be 'treated alike under like circumstances and conditions' is not violated when one person is treated differently than others, because treating like individuals differently is an accepted consequence of the discretion granted."

*Robertson*, 2008 WL 4822218 at *9-10 (quoting *Engquist*, – U.S. at –, 128 S.Ct. at 2154) (emphasis

added). As a matter of basic English grammar, the highlighted phrase "such cases" has one and only one clear antecedent: the "forms of state action", referred to in the previous sentence, "which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized factors." Notably, *Engquist* did not purport to limit "such cases" to "claims brought by government employees" or "claims challenging decisions by law-enforcement officials", and Magistrate Judge Scoville perceptively recognized as much.[14]

---

[14]

*Accord* **2ⁿᵈ Circuit**, *Ponterio v. Kaye*, – F. App'x –, –, 2009 WL 1024666, *2 (2d Cir. Apr. 16, 2009) ("In light of the 'very nearly unfettered discretion' of defendants in determining whether to grant or deny the applications for certification of retired state judges, we conclude that *Engquist* bars Ponterio's equal protection claim in this action.");

**4ᵗʰ Circuit,** *George v. Kanawha Cty. Sheriff's Dep't*, 2009 WL 347782, *2 (S.D. W. Va. Feb. 3, 2009) (stating, "the Supreme Court has intimated very recently that its class of one jurisprudence may not have any application in the subjective context under consideration", and holding that class-of-one theory did not apply to police officer's choice of plaintiff for a traffic stop);

**9ᵗʰ Circuit,** *Tounget v. City of Hemet*, 2009 WL 536835, *7 (C.D. Cal. Feb. 24, 2009) ("the Supreme Court indicated that a 'class of one' claim may have limited application in challenges to 'discretionary decisionmaking.") (citing *Engquist*, – U.S. at –, 128 S.Ct. at 2154);

*Occhionero v. City of Fresno*, 2008 WL 2690431, *9 (E.D. Cal. July 3, 2008) (dismissing class-of-one claim challenging city's execution of an inspection/abatement warrant for plaintiff's recycling business) (accepting party's admonition not to "read *Olech* too broadly and [risk] transforming federal courts into second-guessers of the reasonableness of local decision making", court "heeds the warning . . . in *Engquist* as to undermining discretion");

**11ᵗʰ Circuit**, *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273-74 (11ᵗʰ Cir. 2008) (<u>Wilson</u>, Pryor, D.J. Middlebrooks) (class-of-one theory was not available to a highway paving contractor alleging that DOT singled him out for less favorable treatment than other contractors);

**D.C. Circuit**, *Tate v. DC*, 601 F. Supp.2d 132, 137 (D.D.C. 2009) (taking *Engquist* to stand for the broad proposition that "'some forms of state action . . . by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments' that they simply are not amenable to an equal protection challenge in the absence of a claim based on such suspect classifications as race or gender [sic, sex]" and treating government employment and traffic enforcement as merely two examples of this general principle).

As the First Circuit aptly stated, "[t]he *Olech* class of one suit serves an important but relatively narrow function. It is not a vehicle for federalizing run-of-the-mill zoning, environmental, and licensing decisions." *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1ˢᵗ Cir. 2006); *see, e.g., Buell v. Hughes*, – F. Supp.2d –, –, 2009 WL 270361, *7 (D. Conn. Jan. 12, 2009) (dismissing teachers' class-of-one Equal Protection claim under Rule 12(b)(6) and noting, "It is not the role of the Court to micromanage the administration of the school system."). This view is sensible, and it bars JDC's class-of-one equal protection claim as a matter of law, without reference to the facts alleged. (The only relevant fact – actually a mixed law/fact determination – is the undisputed fact that the Commission's decision on a temporary charitable-gaming license involves the exercise of discretion). If the court were to permit class-of-one claims in situations like this one where the state agency's decision unavoidably involves the exercise of discretion, it could open the floodgates for constitutionalizing "quotidian" disagreements with government "judgment calls." As the Tenth Circuit wisely cautioned, presaging *Engquist*,

> In the wake of *Olech*, lower courts have struggled to define the contours of class-of-one cases. All have recognized that, *unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decisions made by state actors.* It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently than others, with regard to everything from zoning to *licensing* to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. *This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decision-making: a role that is both ill suited to the federal courts and offensive to state and local autonomy in our federal system.*

*Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10ᵗʰ Cir. 2004) (emphasis added), *cited by Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1221 n.3 (10ᵗʰ Cir. 2008) ("this and other

circuits 'have proceeded cautiously in applying the theory, sensitive to Justice Breyer's warning against turning even quotidian exercises of government discretion into constitutional causes'") (quoting *Jicarilla Apache Nation v. Rio Arriba Cty.*, 440 F.3d 1202, 1290 (10th Cir. 2006)).   In short, artificially confining *Engquist*'s limitation on the class-of-one doctrine to the public-employment context, as JDC prefers, "could transform the federal courts into general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system."  *Jicarilla*, 440 F.3d at 1209 (citation omitted).

**Our Circuit, however, has not yet issued a published decision expressly extending *Engquist*'s limitation on this doctrine beyond the government-employment context.**[15] **Therefore, out of an abundance of caution, this court will analyze whether JDC could state a class-of-one claim on the facts it has alleged.**  It cannot.

"Rational basis review begins with a strong presumption of constitutionality," and as plaintiff JDC bears the burden of demonstrating that the challenged action (the denial of the third parties' Millionaire Party licenses) lacked a rational basis.  *See Brentwood Academy v. Tenn. Secondary Schools Athletic Ass'n*, 2008 WL 2811307, *2 (M.D. Tenn. July 18, 2008) (Todd Campbell, J.) (citing *Graham v. Mukasey*, 519 F.3d 546, 551 (6th Cir. 2008)).  While generally obliged to accept non-movant JDC's well-pled factual allegations as true, the court may also credit any factual allegations by the defendants which JDC concedes or fails to effectively dispute with competent evidence.  Moreover,

---

[15]     The Supreme Court has cited *Engquist* only once so far, in a case that did not involve a class-of-one Equal Protection claim.  *See DC v. Heller*, – U.S. –, – n.27, 128 S.Ct. 2783, 2818 n.27 (2008).

while the court must presume the truth of all allegations in the complaint when evaluating a Rule 12(b)(6) motion to dismiss, *allegations of animus do not overcome the presumption of rationality* and the court evaluates those allegations [only] once a plaintiff has shown facts that show the irrationality of the government action in question. This standard reflects the fairly intuitive idea that a given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity.

*Kohlman v. Village of Midlothian*, 2009 WL 1381339, *4 (N.D. Ill. May 15, 2009) (quoting *Flying J, Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008)).

**Even if the class-of-one theory is available to JDC, the rational-basis standard does not present a high hurdle for the Commission.** Our Circuit cautions rational-basis plaintiffs that this standard is "highly deferential" and "courts hold [government action] unconstitutional under this standard of review only in rare or exceptional circumstances." *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (Cole, Clay, <u>Gilman</u>). The Supreme Court recently observed that "almost all laws . . . pass rational basis scrutiny." *DC v. Heller*, – U.S. –, – n.27, 128 S.Ct. 2783, 2818 n.27 (2008) (J. Scalia for the Court, joined by C.J. Roberts and JJ. Kennedy, Thomas, and Alito). The government actor is entitled to a presumption of rationality, *see Sisay v. Smith*, 310 F. App'x 832, 844 (6th Cir. 2009) (Clay, Griffin, <u>N.D. Fla. D.J. Stafford</u>), and the court must sustain government action against a rational-basis challenge "in areas of social and economic policy . . . if there is any *reasonably conceivable* state of facts that could provide a rational basis" for the decision. *Swisher Int'l, Inc. v. Shafer*, 550 F.3d 1046, 1060 (11th Cir. 2008) (quoting *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 313 (1993)) (emphasis in original).

Notably, the class-of-one claimant "need not [directly] demonstrate that 'the challenged government action was motivated by animus or ill will'" *if* he can negate "'*every conceivable basis* which might support the government action.'" *Loesel v. City of Frankenmuth*, 2009 WL 1449049,

*2 (E.D. Mich. May 22, 2009) (Ludington, J.) (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)) (other internal alterations and quotation marks omitted) (emphasis added). "By definition, a 'conceivable' basis does not even have to have been articulated by the decisionmaker at the time of the decision." *Loesel v. City of Frankenmuth*, 2009 WL 817402, *15 (E.D. Mich. Mar. 27, 2009) (Ludington, J.) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 9 (1992)); *accord Unruh v. Moore*, – F. App'x –, –, 2009 WL 1310981, *2 (5th Cir. May 12, 2009) (holding that prisoner failed to state a class-of-one equal-protection claim, noting, "the prison officials clearly had rational grounds for denying Unruh's application [for a job in a minimum-security facility]. * * * The fact that these reasons were not communicated to Unruh when his application was rejected is irrelevant.").

**Generally, an equal-protection plaintiff must show that he was treated differently from at least one similarly situated individual,** and "[t]o satisfy this threshold inquiry, it must allege that it and other individuals who were treated differently were similarly situated *in all material respects*." *Taylor Acquisitions, LLC v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009) (McKeague, Griffin, S.D. Ohio D.J. Weber) (citing *TriHealth, Inc. v. Bd. of Comm'rs of Hamilton Cty., Ohio*, 430 F.3d 783, 790 (6th Cir. 2005)) (emphasis added).

**Moreover, courts should enforce the similarly-situated requirement with particular strictness when the plaintiff invokes the class-of-one theory rather than the more settled cognizable-group theory.** *Accord Leib v. Hillsborough Cty. Pub. Trans. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) ("[W]e have frequently noted that the 'similarly situated' requirement must be rigorously applied in the context of 'class of one' claims.") (citations omitted); *Smith v. Defendant A*, 2009 WL 1514590, *4 (S.D.N.Y. May 29, 2009) ("Class-of-one plaintiffs must show *an extremely high degree of similarity* between themselves and the persons to whom they compare

themselves.") (citing *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)) (emphasis added). The court is not aware of any precedent precluding us from adopting the Seventh Circuit's sensible requirement that "[t]o be considered similarly situated, the class of one challenger and his comparators *must be prima facie identical in all relevant respects or directly comparable in all material respects*", *Labella Winnetka, Inc. v. Village of Winnetka*, 2009 WL 721136, *3 (N.D. Ill. Mar. 18, 2009) (quoting *US v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008)) (emphasis added), and the First Circuit's statement, when analyzing a class-of-one claim, that "'plaintiffs must show *an extremely high degree of similarity* between themselves and the persons to whom they compare themselves.'" *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2006) (quoting *Clubside, Inc. v. Valentin*, 468 F,.3d 144, 159 (2d Cir. 2006)) (emphasis added).

This strict enforcement of the similarly-situated requirement is a vital way of minimizing "the risk that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors", *Jennings v. City of Stillwater*, 383 F.3d 1199, 1211 (10th Cir. 2004).

Whether individuals or entities are similarly situated is generally a question of fact for the jury; "however, where there is no genuine issue of fact that such a comparator exists, the court may decide this matter on summary judgment." *Smith v. Atlanta Indep. Sch. Dist.*, 2009 WL 1259209, *15 (N.D. Ga. May 4, 2009) (citing *Eggleston v. Bieluch*, 203 F. App'x 257, 264 (11th Cir. 2006) and *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1273-74(11th Cir. 2008)); *accord Osborne v. Fernandez*, 2009 WL 884697, *40 (S.D.N.Y. Mar. 31, 2009) ("Whether the plaintiffs and her comparators are similarly situated is a question of fact. Like all questions of fact, should the plaintiff

fail to establish a genuine issue of material fact on this element . . . , a court may grant a defendant's motion for summary judgment . . . .") (citing, *inter alia*, *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 779 (2d Cir. 2007)). While a plaintiff need not demonstrate that he is identical to the person who allegedly received more favorable treatment, *US v. Odeneal*, 517 F.3d 406, 420 (6th Cir. 2008), "the plaintiff and the [person] with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant respects." *Arendale v. City of Memphis*, 519 F.3d 587, 604 (6th Cir. 2008) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)), *reh'g & reh'g banc denied* (July 31, 2008).[16]

**JDC cannot show that it is "similarly situated" to other Michigan charitable-gaming equipment suppliers in a key respect:** JDC was formed, and is owned and operated, by the spouse of an individual who voluntarily surrendered his company's supplier license (rather than try to rebut a long catalogue of dishonest and illegal conduct) and who told lottery officials that he hoped to remain in the field of Michigan charitable gaming, and it was formed just before the husband's

---

[16]

JDC cites only decisions from other circuits for the standard governing the similarly-situated determination. Decisions from other circuits, of course, lack precedential force in our circuit. It may be useful to quote out-of-circuit decisions when they contain a particularly cogent expression of a principle or a particularly eloquent or apt phrase. They may also be cited as "illustrative" authority when their facts provide a useful comparison or contrast to the facts of the case *sub judice*. There is also nothing objectionable about citing first Sixth Circuit precedent and then an out-of-circuit decision which is in "accord" with the rule or reasoning of our precedent.

The legal standard governing a claim, defense, or motion, however, must be drawn exclusively from United States Supreme Court decisions and published Sixth Circuit Court of Appeals decisions, whenever they are available. Such precedentially binding decisions are available which state what the "similarly situated" standard requires. Accordingly, this court disregards the invocation of the First, Second and Eighth Circuits' purported standards on the issue. *See* JDC Supp Br at 2 nn. 2-4 (citing *Dartmouth Review v. Dartmouth College*, 889 F.2d 13 (1st Cir. 1989) and *Martin v. Citibank, N.A.*, 762 F.2d 212, 217 (2d Cir. 1985) and *Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 (8th Cir. 1985)).

company was to surrender its license.

JDC identifies *no* charitable organizations that were granted gambling-fundraiser licenses in the face of the same or even arguably-similar associations and history. The Seventh Circuit has illustrated the legitimacy of a government agency considering license applicants' respective histories, or the apparent traits or record they evinced which might bear on a legitimate State interest in light of past events. In *Herro v. City of Milwaukee*, 44 F.3d 550 (7th Cir. 1995), a local government denied the plaintiff's tavern license application, but nine months later approved someone else's application to license a tavern at that same location, and he asserted a class-of-one Equal Protection claim. *See Herro*, 44 F.3d at 550-51. Affirming the dismissal of the claim, the Seventh Circuit logically relied heavily on the undisputed fact that the successful applicant had procured work permits and provided renovation plans, while the plaintiff had not. *See Herro*, 44 F.3d at 552. That was a conceivable rational basis for the differential treatment, *particularly because the officials were entitled to consider the area's history of problems with crime and litter.* *Id.* "[U]nder these circumstances," the panel declared, "searching for an extremely responsible licensee would be a legitimate goal, and differentiating between two applicants based on the fact that one appeared more committed than the other to the longterm condition of the premises would be a rational means of achieving it." *Id.*

Even after oral argument, JDC has not contested the Commission's statement, MTD at 16-17, that none of the four other Michigan charitable-gaming locations mentioned by JDC – "Poker Zone" in Holland, "Spectrum Lanes" in Wyoming, "Lincoln Country Club" in Standale, and "Poker Palace" in Ann Arbor – had ever been found to be in violation regarding a charitable-gaming event, and none of them was owned or operated by the spouse of a serial violator of the charitable-gaming

regulations.[17] JDC's supplemental post-hearing brief begins with the following concession:

> At the February 17, 2009 hearing, Your Honor indicated that certain additional information would be helpful. Specifically, you wanted to know if the four organizations alleged to be similarly situated to JDC in its complaint[18] had principal officers with spouses who had been cited by Lotto [sic, the Michigan Lottery Commission] for non-compliance issues. [T]he direct answer to this inquiry is "no"
> . . . .

Plaintiff JDC's Supp. Br. filed Mar. 3, 2009 ("P's Supp Br") at 1. JDC gamely insists that "that is not necessarily fatal" to its equal protection claim. *Id.* On this record, however, JDC's concession of this fundamental material difference between it and the four putative comparator businesses *is* fatal to its equal-protection claim.

**Moreover, JDC fails to show a genuine issue as to its assertion that former All-In employee Jeanine Reynolds was similarly situated to Jennifer Allen.** On this score, JDC's supplemental brief consists entirely of allegations which are not supported by *any* citation to evidence in the record, such as an affidavit or a deposition transcript. JDC merely asserts as follows:

> [T]here is still the issue of Jeanine Reynolds. While Ms. Reynolds worked full time for All-In and earned a competitive salary, Mrs. Allen only worked between 15-25

---

17

This court need not, and generally does not, consider arguments, theories, or evidence raised for the first time at oral argument. If JDC had evidence of other former All-In employees whom it believed were similarly situated to it for equal-protection purposes, it could and should have presented all of that evidence, as to all such comparators, in its briefs prior to the hearing. *See Maher v. Int'l Paper Co.*, 600 F. Supp.2d 940, 948 (W.D. Mich. 2009) (Maloney, C.J.) ("Maher could and should have made the argument . . . in her opposition brief (or by obtaining leave of court to file a sur-reply brief that raised the issue). By failing to do so, Maher waived the argument.") (citing, *inter alia*, *Roberts v. Principi*, 283 F. App'x 325. 332 n.3 (6th Cir. 2008) (McKeague, J.) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 714 (6th Cir. 2001)), *cert. denied*, – U.S. –, 129 S.Ct. 516 (2008)).

18

*Contrast Ruttenberg v. Jones*, 283 F. App'x 121, 131 (4th Cir. 2008) (affirming dismissal of tavern owners' class-of-one claim that State selectively enforced liquor and other regulations against them, because *the complaint* failed to allege the existence of similarly situated establishments).

hours a week[,] earning approximately $150 per week.

Ms. Reynolds was a Sale[s]/Tech Representative for All-In. On the sales end, her duties included soliciting non-profit organizations that qualified for millionaire party events; helping said organizations through the State's qualification requirements; and ensuring [that] licensing, advertising, and training time lines were met. On the technical support end, her duties included training dealers; helping organizations set up "house rules"; managing game formats and game schedules; onsite event management and trouble shooting; running events from startup to closing; overseeing pit bosses, dealers, and circuit clerks; and post event quality assurance meetings with organizations. Ms. Reynolds also had the responsibility of setting up, cleaning, and tearing down equipment; taking inventory; and analyzing each event's need for additional games/equipment.

Mrs. Allen's position with All-in could be described as that of a secretary or, at best, an office manager. Her duties included answering phones, faxes, emails; organizing office files; scheduling equipment [sic]; attending to miscellaneous accounting issues; printing forms; ordering office supplies; and occasionally signing contracts at the direction of Mr. Allen.

JDC's Supp Br at 4-5. Without citation to evidence, this passage is properly disregarded. It is well settled in our circuit that "'[a]ssertions by counsel do not constitute probative evidence.'" *Kita v. SSA*, 2009 WL 1464252, *7 (W.D. Mich. May 18, 2009) (quoting *In re Cohara*, 324 B.R. 24, 28 (6th Cir. BAP 2005) (citations to out-of-circuit decisions omitted)); *see also Johnson v. Bell*, 525 F.3d 466, 485 (6th Cir. 2008) (noting with approval a jury instruction that "[s]tatements, arguments, and remarks of counsel . . . are not evidence"), *cert. denied*, – U.S. –, 129 S.Ct. 1668, *reh'g den.*, – U.S. –, 129 S.Ct. 2427 (2009); *DeJager Const., Inc. v. Schleininger*, 1996 WL 73168, *8 (W.D. Mich. Mar. 13, 1996) (Quist, J.) ("Statements of counsel, while binding as stipulations or concessions if made in open court or in writing, are not 'evidence' . . . . They are mere argument."). *See, e.g., Tapco Prods. Co. v. Van Mark Prods. Corp.*, 446 F.2d 420, 423, 428 (6th Cir. 1971) ("[T]he demonstration by opposing counsel more properly should have been made as part of the cross-examination of Dr. Youngdahl, or at least it could have been supported by sworn testimony of

witnesses . . . . The unsworn, self-serving statements of counsel are not evidence.").[19]

The court is left with one statement by JDC's counsel which *is* supported by adequate citation to evidence in the record, and one statement which is supported by an inadequate generic citation. In an attempt to show that Reynolds was similarly situated to Jennifer Allen, JDC alleges that "Reynolds signed contracts on behalf of All-In." JDC Supp Br at 5. In support of this allegation, JDC cites its Exhibit 2, which consists of four All-In Entertainment Group Event Contracts which Reynolds signed on behalf of All-In in 2007. *See* JDC Supp Br, Ex 2 (January 6 and February 6 contracts with Northern Little League, January 9 contract with Lupus Alliance of America, and March 6 contract with Wildlife Rehab Center). The Commission does not contest the authenticity, admissibility, or accuracy of these four contracts. Therefore, this evidence is sufficient to permit a rational factfinder to find that Reynolds signed those four contracts on behalf of All-In.

JDC next alleges that "[w]hile Mrs. Allen was never cited for anything, Mrs. Reynolds was

---

19

The court also is entitled to disregard the following statements by JDC's counsel because they are unsupported by citation to evidence in the record: "While Ms. Reynolds was the president of Women with Wings, she was also the executive director of the Alliance for Environmental Sustainability. These are both presumably charitable organizations." JDC Supp Br at 5. The court thus intimates no opinion as to whether Reynolds was president of an organization called Women with Wings, whether she was executive director of an organization called the Alliance for Environmental Sustainability, and whether those are charitable organizations.

*See, e.g., Griffin v. Reznick*, 609 F. Supp.2d 675, 699 n.2 (W.D. Mich. 2008) (Maloney, C.J.) ("The Griffins' brief in opposition . . . provided a detailed description of what they allege happened at their home on December 22, 2005. However, the Griffins did not cite any document filed with court under oath or penalty of perjury, such as an affidavit or deposition transcript. * * * Accordingly, the court disregarded the Griffins' counsel's assertions about what happened on December 22, 2005, and will continue to disregard them until and unless they are supported by citations to affidavit, deposition, or the like.") (citing *EEOC v. Rocket Enters., Inc.*, 2007 WL 4126527, *3 n.1 (E.D. Mich. Nov. 19, 2007) ("In the brief, Plaintiff also argues that Charles Bowers told Bischoff . . . . However, Plaintiff failed to cite to any evidence, and this exchange was not included in the deposition excerpt provided. Thus, the Court did not consider this remark . . . .")).

cited by Lottery for specific violations." JDC Supp Br at 5. In support of this allegation, JDC attaches the Commission's October 8, 2007 Notice of Intent to Commence Formal Proceedings against All-In / Mike Allen / Shannon McDonough. *See* JDC Supp Br, Ex 3.

But JDC fails to specify where the nine-page, single-spaced October Notice alleges that Reynolds violated the law in some way, and it is not the court's job to scour the record for the requisite specific evidence to create genuine issues of material fact on JDC's behalf. *See Adams v. Lockheed Martin Energy Sys., Inc.*, 199 F. App'x 405, 410 (6th Cir. 2006) ("Plaintiffs suffer from a paucity of supporting evidence, neglecting to target any specific facts . . . . Instead, *they* offer general allegations and *cite to entire depositions rather than specific supporting testimony of a deponent.*") (emphasis added); *cf. Hubbert v. Brown*, Nos. 95-1983 & 95-1988 & 96-1078, 114 F.3d 1187, 1997 WL 242084, *6 (6th Cir. May 8, 1987) (p.c.) (Keith, Merritt, Cole) ("There is no reason . . . why defendants' attorney should be permitted to shift his duty to represent his clients to the court by simply throwing . . . documents at the Court and hoping the Court finds something it will interpret as supporting his arguments.").

Nonetheless, the court has reviewed the October 8, 2007 Notice and found the following allegation by the Commission, which is presumably what JDC meant to cite:

> At the same time that Ms. Reynolds is the chairperson, principal officer and executive director [of Women with Wings and Alliance for Environmental Sustainability], Ms. Reynolds was also acting as an agent for All-In. In a letter dated March 23, 2009, Ms. Reynolds writes Mike Allen informing him of her decision to "resign as an agent for All-In Entertainment." On the same day, Mike Allen writes a letter accepting her resignation.

JDC Supp Br, Ex 3 at 5 section D.

**In any event, JDC cannot get around three crucial undisputed facts regarding**

**Reynolds. First,** the October 8, 2007 Notice does allege that Reynolds acted as an agent[20] for All-In while serving as an officer of charitable organizations who could or did hold charitable-gaming events conducted by All-In while serving in that capacity, but there is no evidence that Reynolds was ever "cited" or disciplined in any way for that apparent violation of Michigan regulations. The October 2007 and December 2007 Notices of Intent show that All-In was the named violator and the only legal entity held officially responsible for the various employees' and agents' violations of Michigan charitable-gaming regulations. In this instance, the Commission determined that All-In was at fault for Reynolds' hiring – not Reynolds – in violation of MICH. ADMIN. CODE R. 432.21811(1).

**Second**, there is no allegation that Mike Allen mentioned Reynolds to the Commission as a possible candidate to operate All-In or a successor company in his stead if he surrendered his license. It is undisputed that Mike Allen did mention his wife Jennifer as such a possible candidate, at the February 26, 2008 meeting with Commission officials.

**Third and perhaps most important,** there is no allegation that Reynolds was ever married to Mike Allen, or that she had any other contract or legal arrangement with him under which she could be expected to reap substantial profits – All-In's Annual Supplier Report listed more than

---

[20]

The Commission contends that Mike Allen has given changing and contradictory accounts of Reynolds' former status with All-In, referring to her sometimes as an employee, sometimes as an agent, and sometimes as someone who merely performed "contract" work for All-In on an event-by-event basis. *See* Commission's Post-Hearing Supplemental Brief filed March 3, 2009 ("Def's Supp Br") at 1-2 with cited documents; Commission's Response to JDC's Post-Hearing Supplemental Brief filed March 12, 2009 ("Def's Opp to Supp Br") at 7 and *id.* Ex 1, Fourth Affidavit of Deputy Commissioner of the Charitable Gaming Division Michael Petersen ("4th Petersen Aff") ¶¶ 1-2 and 5-7. For purposes of the present summary-judgment motion, it is not material whether Reynolds is best characterized as an All-In employee, agent, independent contractor, or otherwise.

$776,000 in sales for 2006-2007, *see* Doc. 19 Ex 12 – as Jennifer Allen would reasonably be expected to do as Mike Allen's wife (either by sharing in the profits in marriage, or by an award or settlement following divorce). *Cf., e.g.,* Def's Supp Br at 3 ("Lottery has evidence showing that the Allens used co-mingled marital funds to pay for business expenses of the Deuces Wild."), citing *id.* Ex 4 (copy of personal check #5555 to the City of Walker, dated May 16, 2008, drawn on the joint account of "Michael D. or Jennifer L. Allen", signed by Jennifer Allen, and bearing the handwritten words "Dueces [sic] Wild" above the names and address in the top left corner of the check).

Moreover, in August 2008, Reynolds sent a letter assuring the Commission's Charitable Gaming Division that she and her husband "will not be using the services of, or representing in any way" All-In, Mike Allen, Jennifer Allen, former All-In co-owner Shannon McDonough, and several other individuals. *See* Def's Supp Br, Ex 3.

**In short, JDC fails to show a genuine issue as to whether former All-In agent or employee Jeanine Reynolds was similarly situated to Jennifer Allen / JDC** for purposes of charitable-gaming licenses for them or their would-be business partners.[21] *Cf. Copar Pumice Co., Inc. v. Morris*, 2009 WL 1563515, *11-12 (D.N.M. May 11, 2009) (although state environment department had levied higher fines on plaintiff than another company for noncompliance with its air-quality permit, class-of-one claim failed; the other company was not similarly situated, because its record-keeping violation lasted three *months* and plaintiff's record-keeping violation lasted three

---

[21]JDC does not present specific evidence, and articulated argument, for the notion that some other former All-In employee or agent was similarly situated to Jennifer Allen for this purpose. Accordingly, the court need not discuss the Commission's supplemental argument that former All-In "pit bosses" Greg Oosterhouse, Jonathan Parker, Jeffrey Oosterhouse, and Benjamin Strahm, and former All-In "circuit clerk" Christine Steimel, were not similarly situated to Jennifer Allen. *See* Def's Supp Br at 3-5 and 6.

*years*); *Nahas v. City of Mountain View*, 2005 WL 2739303, *2 and *4-5 (N.D. Cal. Oct. 24, 2005) (rejecting class-of-one challenge to city's imposition of restrictions on night-club – excluding people under 21 years of age, limiting patrons' in-and-out privileges, and prohibiting evening hours on certain days – where club failed to identify any more-favorably treated establishments which had elicited equivalent public complaints about noise coming from sound system and about the conduct of people in the adjacent public parking lot); *Lumbreras v. Roberts*, 319 F. Supp.2d 1191 (D. Or. 2004) (dismissing farm and forest labor contractor's class-of-one claim that state agency violated equal protection by suspending plaintiff's license while merely fining another licensee; plaintiff had used untrained firefighters and had a history of wage-law violations, whereas the allegedly similarly-situated licensee did not have untrained firefighters in the field and its prior violations were "minor 'paperwork violations'"), *aff'd*, 156 F. App'x 952 (9th Cir. 2005).[22]

Finally, as to the only entities whom the record suggests *were* similarly situated to All-In – having committed the same major violation as All-In admittedly had, exceeding the $15,000 daily limit on revenue taken in at a charitable gaming event – the Commission stated, without contradiction from Allen, that it had taken equally stern measures against those parties. At a face-to-face meeting on February 26, 2008, the parties had this exchange:

MR. ALLEN:          So I think we're almost being punished because we were the

---

[22]

*Cf. Garber v. Flores*, 2009 WL 1649727, *10 (C.D. Cal. June 10, 2009) (dismissing class-of-one equal protection claim of homeless man who alleged that police ticketed him for refusing to move his car when asked, because he was homeless, when they did not ticket non-homeless people for the same infraction; "plaintiff's allegations that other vehicles were left '[i]n the same location [where] plaintiff's vehicle was cited . . . , ' and that the 'LAPD have come to the very location but never ticketed those vehicles,' fall far short of showing that plaintiff was treated differently from any similarly-situated person. Not only was there no factual basis to infer that these vehicles did not belong to homeless people, but *plaintiff was cited for a missing headlight and a missing license plate, not for parking his vehicle in the location where he was ticketed*.") (emphasis added).

biggest one and you wanted to, you know – look, you came after us first, right?

MR. PETERSEN:     Oh, no, no, not the case at all, in fact, no – our work was being spread over a number of places.  The problem is, it was at your two locations.  We didn't find it anywhere else and we did the exact same techniques and we're getting pretty good at that.  We didn't find it and we were looking to make sure, and they [other charities] were cutting off sales at $15,000.  They were just shutting it right down.

Your locations, they just knew all the little tricks, they just write down the sales half way through the event, we could see that, and we saw it.  Then afterwards, when it got to $15,000, they still kept on selling, you know, and then – you kind of knew what was going on, we were catching on too.  Now we did have a couple of places in Kalamazoo that we did have to shut down.

MR. REICH:     We've had a lot of suppliers in here.

MR. PETERSEN:     And we did, and they're gone.  They are gone now.  So, no, we definitely did not target you guys at all.  You guys, the stuff was just going – it was rampant.  It was easy to catch.  That's the part that kind of surprised me, was just how flagrant it was.  Our guy would just stand right there and just look at him do it.  Just right there and he'd be talking to him, while they were selling the chips.  It's like nuts, you know.  And it wasn't just one time, it wasn't twice, and was happening all the time.  (inaudible) with your locations.

* * *

MR. ALLEN:     I'm not denying that we had some problems at some of our locations, especially the Lansing –

MR. PETERSEN:     Deltaplex.

MCDONOUGH:     And we had a couple at the Deltaplex . . . .

All-In Tr. 21:14 to 23:13; *see also id.* 35:20-21 (Mike Allen states, "Were charities going over $15,000?  Yes, they were going over $15,000.").

**Accordingly, in the absence of evidence of similarly-situated applicants who were treated more favorably, the court need not inquire whether there was a rational basis for the disparate treatment.**  *See Rondigo, LLC v. Casco Twp., Michigan*, – F. App'x –, 2009 WL 1362390, *6 (6th Cir. May 13, 2009) (Moore, McKeague, E.D. Ky. D.J. Forester) (in case claiming

selective enforcement of zoning ordinances against a commercial-composting operation, court remarked, "Rodrigo's equal protection claims are based on the second ground, that Casco discriminated against Rondigo based on the gender of its principal . . . and the third ground, otherwise known as a 'class of one' theory.  * * *  Because we conclude that Rondigo and Indian Summer were not similarly situated . . . the district court did not err in granting summary judgment on Rondigo's equal-protection claims."); *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir.) ("Although the plaintiffs claim that they have been treated differently from other individuals seeking rezoning, they fail to allege any specific examples of similarly situated individuals, let alone evidence of situations where the proposed rezoning was similar in scale or impact.  As a result, we need not apply the rational basis test . . . .") (citing *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.3d 1031, 1037 (6th Cir. 1992) ("[W]e need not even go so far as to apply the rational-basis test because [the plaintiff] has failed to demonstrate that the Board treated him differently from similarly situated individuals.")), *reh'g & reh'g en banc denied* (6th Cir. Dec. 1, 2008), *cert. denied*, – U.S. –, 129 S.Ct. 628 (2008).[23]

_____

[23]

*See also Taylor v. City of Detroit*, 2009 WL 500778, *3 (E.D. Mich. Feb. 27, 2009) (dismissing class-of-one equal protection claim alleging selective enforcement of ordinance prohibiting the parking of inoperable, unregistered motor vehicles on public streets) ("The Court need not address the second prong of the *Olech* test [rational basis] as Plaintiff has failed to demonstrate that he has been treated differently than others who are similarly situated."); *Zamorano v. Wayne State Univ.*, 2009 WL 224553, *12 (E.D. Mich. Jan. 30, 2009) (Victoria Roberts, J.).

*Accord Bartlett v. Crook Cty., Oregon*, 2009 WL 1176465, *6 (D. Or. Apr. 28, 2009) (granting SJ to defendant on class-of-one claim that country road department arbitrarily required plaintiffs to comply with standards not required of others and falsely stating that project had not been inspected by the department) (stating, "to establish a *prima facie* case that the individual plaintiffs denied plaintiffs their civil right to equal protection under the law, plaintiffs must present some evidence that they were treated differently than other similarly-situated road builders.  There is none.  To the contrary, the record reflects [that] the Keller affidavit was generated *based on a specific set of unique circumstances that was not germane to other road builders.*") (emphasis

**In any event, JDC has made no showing that the Commission lacked a rational basis for treating it differently than companies who lack such an intimate association and history with an apparent serial violator.**[24] Surrendering All-In's supplier license meant forgoing its right

---

added);

*Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 2009 WL 995477, *8 (N.D. Ill. Apr. 14, 2009) (dismissing class-of-one challenge to city's issuance of restricted instead of unlimited liquor license) ("[I]t is not for this court to determine who is right, but rather to see if 'any set of facts reasonably may be conceived to justify' Defendants' actions. Given that the Council has received complaints regarding PSB, the court cannot say that limiting PSB's alcohol distribution hours is an irrational response.") (citing *Wroblewski v. City of Washburn*, 965 F.2d 452, 459-60 (7th Cir. 1992));

*Chachas v. City of Ely, Nevada*, 2009 WL 905048, *9, – F. Supp.2d –, – (D. Nev. 2009) (granting summary judgment to defendant city against class-of-one claim that it charged plaintiff motel higher utility fees and subjected it to stricter business-license requirements than others, without a rational basis) ("As evidence that Defendants charged him higher [utility] fees than similarly situated hotels, Plaintiff offers a utility statement for the Rustic Inn . . . .  * * *  Plaintiff provides no evidence demonstrating that the Rustic Inn is a similarly situated business with regard to the number of rentable rooms, the type of rooms, the amount of water consumed, and other potentially relevant factors to the similarity determination. To the contrary, Defendants have provided evidence that the Rustic Inn has twelve rooms and no kitchens. * * * [B]ecause the Town and Country Motel had four kitchens and because the fees for kitchens were greater, its utility fees were greater than th[ose] of the Rustic Inn.") (record citations omitted);

*Smith v. City of Bethlehem*, 2009 WL 564620, *7 (E.D. Pa. Mar. 5, 2009) (dismissing class-of-one claim that city zoning board subjected plaintiff to more stringent zoning requirements than others, because he failed to identify similarly-situated property-owners who were treated better);

*Purvis v. Bd. of Ed. of Hall H.S. Dist. No. 502*, 599 F. Supp.2d 968 (C.D. Ill. 2009) (dismissing class-of-one claim against school and police officials; high school teacher accused of sexual intercourse with minor student was not similarly situated to dean who had been accused of sexual misconduct based on inappropriate touching of student's buttocks).

[24] There is persuasive authority which sets up a demanding hurdle for a class-of-one plaintiff at this stage: "Where a plaintiff succeeds in identifying similarly-situated individuals, plaintiff must also (1) refute every conceivable basis that might support the government action, or (2) demonstrate that the challenged action was motivated by animus or ill-will." *Benjamin v. Brachman*, 246 F. App'x 905, 927 (6th Cir. 2007) (Rogers, Griffin, <u>D.J. Cohn</u>) (citing *Klimik v. Kent Cty. Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004) (C.J. Boggs, <u>Gibbons</u>, D.J. Gwin)).

to a formal hearing before an ALJ, possibly followed by appeal to a state court. First, this court cannot say it was irrational for the Commission to treat the surrender as Mike Allen's concession that he could not rebut at least some of the numerous serious charges lodged against him and All-In in the October and November 2007 Notices of Intent. On the contrary, both Mike Allen and Shannon McDonough admitted, in a face-to-face conversation that the Commission audiotaped with their knowledge and consent, that All-In had committed at least one of the alleged violations. Mike and McDonough had this exchange with Commission officials on the record:

> MR. PETERSEN: Then why didn't you go out there and enforce it?
>
> MCDONOUGH: We did. Our last problem we had was I think it was August or September [presumably 2007]. And we did enforce it. And we did tell them [the charities]. * * *
>
> MR. PETERSEN: No, but why –
>
> MCDONOUGH: We had so many problems –
>
> MR. PETERSEN: But we could find it. You guys were there. You knew it was – you had to have known it was going on.
>
> MR. ALLEN : Mike, it was terrible, *I mean, we were aware of it, yes. I don't deny that we weren't [sic] aware of it. And I don't think I ever denied that we weren't [sic] aware of it.*
>
> MR. PETERSEN: *Then you should have stopped it.*
>
> MR. ALLEN : *But, and we did try, I mean . . . .*

All-In Tr. 13:10 to 14:5 (emphasis added). It was in this context that Jennifer Allen founded JDC on April 30, 2008, only 30 days before the scheduled surrender of the All-In supplier license on May 31, 2008, and she remains married to All-In co-owner Mike Allen. The court cannot hold that it is irrational to proceed on the premise that a person will endeavor to benefit his or her spouse financially and otherwise.

-46-

Nor was it irrational to assume that when someone runs a small business, his spouse often is privy to private or secret aspects of the business. Based on this premise, the Commission could infer that Jennifer Allen knew about at least some of All-In's alleged violations of charitable-gaming law. After learning All-In was breaking the law, there is no allegation that Jennifer tried to convince Mike to stop All-In's violations or reported those violations to the Commission. The Commission could rationally infer that because Jennifer was willing to overlook, and perhaps participate in, Mike's violations with All-In, she was willing to let him commit similar violations through JDC.

Applied to the facts of this case, it was not irrational to infer that (1) Jennifer formed JDC with the intent and purpose of supplying the Millionaire Parties that Mike could and would have pursued himself but for his decision to surrender All-In's license, and (2) Mike was surreptitiously helping to run JDC and would be involved in any gaming events JDC was allowed to operate.[25]

Moreover, absent evidence to the contrary, the Commission could rationally conclude that Mike Allen would receive income from JDC, or indirectly benefit from JDC's bookings, by virtue of his marriage to Jennifer and their presumed sharing of income and joint ownership of assets. In other words, if it granted millionaire's party licenses for which JDC was the equipment supplier or the premises lessor, Mike would earn substantial profits from such events – perhaps even the same profits as he did before the Commission caught onto his alleged pattern of illegal, deceptive behavior.

---

[25] The court intimates no opinion as to whether Mike Allen or All-In committed any of the illegal acts charged by the Commission in the two 2007 Notices of Intent to Commence Formal Proceedings. Nor does the court intimate any opinion as to whether Jennifer Allen knew that Mike Allen and/or All-In was violating Commission regulations or encouraged or assisted the alleged violations. Nor does the court intimate any opinion as to the motivations, plans or hopes of Mike Allen or Jennifer Allen regarding the creation of JDC. The point is only that JDC utterly fails to show that the Commission acted irrationally by drawing these inferences, or by acting on them.

**And the inference that JDC is a vehicle for Mike to surreptitiously re-enter the Michigan charitable-gaming supplier business becomes all the more rational when one considers a meeting that Mike had with Lottery officials in February 2008** (after his January 2008 submission of a written promise to surrender All-In's license effective May 30).

On February 26, 2008, Mike Allen and All-In co-owner Shannon McDonough met with defendants Petersen and Reich in Lansing. *See* MTD Reply, Attachment - Third Affidavit of Michael Petersen, dated Oct. 29, 2008 ("3d Peterson Aff") ¶ 5. Mike Allen had requested the meeting so that the two men could "express their intentions" regarding their future in the charitable-gaming arena. *See* 3d Peterson Aff ¶ 6. Mike told the defendants they intended to leave the licensed supplier business because it was too difficult to comply with the Commission's rules and still turn a sufficient profit:

> It's no longer really financially feasible for a supplier to even be in this business. Knowing the fact that you have to be taking – all the costs of the charities into consideration. You have the facility costs, that you have to eat as a supplier. All of the advertising costs, which you have to eat as a supplier. Which none of that stuff was ever in there before so, I mean, we looked at that and said, well supplier is not the way to be anymore. I mean, so do we want to spend money fighting, you know, some of these allegations and stuff like that, or do we want to surrender our supplier license and go in a different direction.
> * * *
> So being a supplier, when you're paying $300 to the State to be a supplier, it just doesn't make sense. So, again, the way the directives [are], and the way you guys are pushing it now, it just doesn't make any sense to be a supplier.

Transcript of Informal Meeting Between Mike Allen & Shannon McDonough and Charitable Gaming Division's Mike Petersen and Tom Reich re: All-In Entertainment on Feb. 26, 2008 ("All-In Tr.") 6:3-16 and 7:13-18. Mike also told them that he and McDonough planned to buy a building and rent it to charities for charitable gaming tournaments, which is close to what Jennifer Allen and JDC tried to do (*leasing* a building and offering to rent it to charities for charitable gaming

documents):

> So – so [what] we come to you today to discuss is, we would like to pursue in a couple different directions. We would like to own a facility, and allow charities to sublease space from us for such things as millionaire party events. And the reason why we're going – we would like to go this direction is, we still have great relationships with the charities in Muskegon, Grand Rapids, even some in Lansing.

All-In Tr. 7:23 to 8:6; *see also* 3d Peterson Aff, second paragraph numbered ¶ 7 and ¶10. Mike also emphasized the sunk costs that he and co-owner Shannon McDonough had incurred to buy equipment, equipment which they were intent on using again to earn a return on that investment, and he proposed renting space to charities for gaming events rather than supplying equipment:

> Us, me and Shannon, personally have over $200,000 invested in equipment, computers, and all kinds of stuff, a trailer to haul all of this stuff around with so, and we have employees that want to continue, you know, somewhat in this fashion and, you know, we've been trying to find ways to sell some of this equipment, and we have sold some.

> But, we really want to talk to you guys about [All-In] owning a facility and allowing charities to come in, sublease that space, and allowing them to raise – or to hold their Texas Hold 'em events. We're not going to be a supplier. All we're going to be is a facility and sublease space to them. * * * So I guess I'm . . . asking you, would you allow us to own a facility and sublease it out to non-profit groups?

All-In Tr. 8:13 to 9:11; *see also* 3d Peterson Aff ¶ 8 (recalling that Mike Allen had remarked that he and McDonough had "$200,000 tied up in All-In's assets . . . equipment [which] has 'no real value unless it is doing something.'").

Defendants Petersen answered that the Commission would not allow Mike Allen and Shannon McDonough to lease premises for gaming events "at this time" "[b]ecause of the violations you had . . . ." *See* All-In Tr. 9:12-16. Allen then asked if his wife or McDonough's wife could buy a building and rent it to charities for that purpose instead. When Petersen said no, "not at this time," Allen asked, "Employees of ours . . . we would sell our equipment to, could they own a facility and

-49-

lease it out?" Petersen responded skeptically to this proposal, noting that "[o]ur problem was that the problems were so wide spread [throughout All-In's] whole operation . . .", but Mike Allen persisted, asking if his brother, for example, could own the building instead. *See* All-In Tr. 9:17 to 10:15. Petersen responded skeptically, reminding Allen that in the Commission's view, the non-compliance was so widespread that it seemed All-In was "ignor[ing] the statute", particularly by advancing $15,000 cash to a charity, allegedly to enable it to hold the event. Petersen also expressed his view that when confronted about the $15,000 violation on July 24 (presumably 2007), Mike had not taken steps to rectify the violation, and All-In actually committed that same type of violation *again* after their discussion about it and "blew off" the Commission's concerns. *See* All-In Tr. 10:16 to 14:6; *see also* 3d Petersen Aff. ¶¶ 11-15. Later in the hearing, Mike asked if he could form a non-profit charity and participate in Michigan charitable gaming in that capacity, and Petersen responded that he would refer the question to the state Attorney General if Allen submitted such a request. *See* All-In Tr. 25:22 to 26:18.

**The Commission could rationally conclude that if charitable groups were permitted to hold millionaire parties on premises leased by JDC or with equipment supplied by JDC, it would be difficult or impossible to prevent the involvement of Mike Allen**, who, although formally holding no position or ownership stake in JDC, is married to its sole owner/operator and has experience in its precise field of business. These inferences are more compelling given the unchallenged statement that "Currently, Mr. Allen has no known occupation." *See* Comm'r Opp at 15. The Commission could rationally infer that Mike's lack of gainful employment would give him both a heightened incentive and ample time to help operate JDC, perhaps by the same prohibited interference with fundraisers that he committed (in the Commission's view) at the helm of All-In.

**In short, even in the unlikely event that the class-of-one theory applies, JDC fails to state a claim.** It has not identified similarly-situated entities that were treated more favorably, *see Aureus Holdings, Ltd. v. Detroit City*, 303 F. App'x 265, 2 (6th Cir. Dec. 9, 2008) (Rogers, Sutton, McKeague) ("they have not pointed to evidence that they were treated less favorable than others similarly situated, such as would support a 'class of one' equal protection claim.") (citation omitted), nor has it shown that the differential treatment "'is so unrelated to the achievement of any combination of legitimate purposes[26] that it can only conclude that the government's actions were irrational.'" *Bower v. Village of Mt. Sterling*, 44 F. App'x 670, 677-78 (6th Cir. 2002) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000)); *see also Iswed v. Caruso*, 2009 WL 230137, *5 (W.D. Mich. Jan. 29, 2009) (Maloney, C.J.) (citing *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006) (citation omitted)).  It is true that

> [i]ntentional discriminatory treatment without rational basis is the hallmark of any equal protection claim, irrespective of the numbers of respective class members. Still, the incongruity between the theory asserted and the facts complained of is manifest and telling.

*TriHealth, Inc. v. Bd. of Comm'rs of Hamilton Cty., Ohio*, 430 F.3d 783, 788 n.3 (6th Cir. 2005) (McKeague, J.) (citing *Olech*, 528 U.S. at 564), *pet. cert. filed o.g.* (U.S. Mar. 9, 2009) (No. 08-1138). *Accord Lewitus v. Colwell*, 479 F. Supp. 439 (D. Md. 1979) (Maryland Racing Commission regulation which barred issuance of licenses to applicants who associated with a person convicted of a crime did not violate Equal Protection, and State could deny license to person who associated

---

[26]

*Accord Manbeck v. Town of Lewisboro*, 2009 WL 1505253, *2, – F. App'x –, – (2d Cir. May 29, 2009) ("Plaintiff's class-of-one [selective-prosecution] claim fails because defendants' pursuit of violations of the wetlands law was rationally related to the legitimate goals of the town wetlands department. '*An Olech-type [class-of-one] equal protection claim focuses on whether the official's conduct was rationally related to the accomplishment of the work of [his] agency.*'") (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 88-89 (2d Cir. 2005)) (emphasis added).

socially with an unrelated person who had had difficulty with racing regulators in several States);[27]

_____

[27]

The district court in *Lewitus* supplied authority for rejecting claims of unsuccessful gaming-license applicants like JDC / Jennifer Allen who complain that the denial of their application constitutes invidious "guilt by association."  *See* JDC Supp Br at 2 ("Lottery would have this court attribute to Mrs. Allen both the prior non-compliance of her husband and the non-compliance of the employees of his former business.  This position of guilty by association lacks any legal support . . . .  In Michigan, husbands and wives are not liable for each other[']s personal debts.  Nor can they be convicted for crimes committed only by the other spouse.").

The *Lewitus* court thoroughly responded to this guilt-by-association complaint, which has superficial, emotional appeal but ultimately lacks merit.  *Lewitus* stated:

> It is true that the regulation as applied to Mr. Lewitus seems somewhat irrational, given that he himself has done no wrong.  However, the equal protection clause does not require that all classifications be drawn with absolute precision.  "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'"  *Dandridge v. Williams*, 397 U.S. 471, 485 . . . (1970) [q]uoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 . . . (1911)[)].

> The Commission had a reasonable basis for believing that anyone who consorts or associates with bookmakers, touts, or others of similar pursuits would be likely to interfere with the scrupulous conduct of racing.  The fact that the plaintiff may in fact pose no threat, or that other more threatening applicants are not excluded by [the] Regulation . . . , does not of itself invalidate the regulation.
>
> * * *
>
> The plaintiff cites authority for the proposition that implicit in the due process clause is the principle that guilt is personal, and that "legal burdens should bear some relationship to individual responsibility or wrongdoing."  *Weber v. Aetna Casualty and Surety Co.*, 406 U.S. 164, 175 . . . (1972). * * * [T]he plaintiff's point is an important one.  Regulation 25B forces him to suffer a genuine deprivation when he is personally guilty of no misconduct.

> Although the court is not without sympathy for Mr. Lewitus' position, the court is satisfied that there has been no violation of any principle of the Fourteenth Amendment.  Due process analysis is ultimately a task of balancing competing interests.  *Wolff v. McDonnell*, 418 U.S. 539, 561 . . . (1974).

> On the one hand, the plaintiff has an interest in racing his horses, in dealing with Mr. Catrone both socially and professionally, and in being free from punishment when he has done no wrong.

*cf. Niglio v. New Jersey Racing Comm'n*, 385 A.2d 925, 926-28 (N.J. App. Div. 1978) (Fritz, P.J.A.D.) (State did not violate equal protection by suspending plaintiff's horseracing license because her "husband, with whom she is living and by whom she is employed as a secretary-bookkeeper, has been convicted of criminal offenses" which disqualified him from holding such a license; the regulation disqualifying the spouse of a disqualified person had a rational relationship to the "appropriately strong State interest" in keeping criminal and unethical elements out of

---

> On the other hand, the Maryland General Assembly, the people it represents, and the Maryland Racing Commission have an interest in assuring that legalized gambling in the state remains "as far above suspicion as possible." * * *

> On balance, the burdens imposed on Mr. Lewitus are outweighed by the broader concerns of the state. As the First Circuit court of Appeals concluded in *Medina v. Rudman*, *supra*, 545 F.2d at 251:

>> Given the social evils associated with gambling and the state's revenue interests, the state's choice of means in the selection of licensees is entitled to prevail over the private interests of potential investors.

> The same conclusion is equally applicable to the private interests of potential owners and racers [and those, like JDC, who hope to earn a profit by providing services to the licensed operators of gambling events].

*Lewitus*, 479 F. Supp. at 446 and 448 (other internal citations omitted) (paragraph breaks added). *Cf. Fox v. Louisiana State Racing Comm'n*, 447 So.2d 70 (La. App. 4th Cir. 1984) (state did not violate woman's equal-protection rights by forbidding her to enter a horse in the same race in which her husband had already entered a horse, because the regulation was reasonable and bore a rational relation to the State's legitimate interest in safeguarding the integrity and honesty of racing and preventing erosion of public confidence in that integrity);

*Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n*, 926 A.2d 908 (Pa . 2007) (although "[g]uilt by association is a philosophy alien to the traditions of a free society", a legitimate purpose of the state Racing Act was to "foster an image of horse racing that [is] irreproachable . . . in the eyes of the skeptical public", and thus "we do not quibble with the proposition that the Commission is well within its discretion to consider an applicant's ties to organized crime in determining whether [he] should be awarded a harness racing license.") (internal citation omitted).

legalized gambling).

JDC also claims that "[d]efendants' arbitrary and capricious deprivation of Plaintiff's liberty interests violates the Substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Comp ¶ 42. The court determines that JDC's substantive due process claim merely recasts its claim under the Equal Protection Clause – so the two claims must rise or fall together. Moreover, it is neither necessary nor appropriate to resort to the substantive due process concept where the Equal Protection Clause, more specifically fitted for such claims, provides a complete rubric for adjudication. As the Supreme Court has held, "'a cause of action cannot be based on substantive due process where a more specific constitutional provision is applicable.'" *Brandenburg v. Hsg. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (Rehnquist, C.J., for a plurality, joined by O'Connor, Scalia & Ginsburg, JJ.) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989) (Rehnquist, C.J.))).[28]

Therefore, just as JDC's failure to show arbitrary and capricious (irrational) conduct by the

_____

[28]

*Accord Ramirez v. Arlequin*, 477 F.3d 19, 25 (**1st Cir.** 2006) (when plaintiffs have asserted both a substantive due process claim and a viable First Amendment claim for the same conduct, "we have declined to 'enter the uncharted thicket of substantive due process to find an avenue of relief.'") (quoting *Nestor Colon-Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 46 (1st Cir. 1992));

*Lindquist v. City of Pasadena, Texas*, 525 F.3d 383, 387-88 (**5th Cir.** 2008) ("The Lindquists complain that the city's refusal to issue them a license violated their substantive due process rights because other dealers received licenses for properties that did not meet the requirements of the licensing ordinance. [T]his claim is the[ir] Equal Protection claim recast in substantive due process terms and cannot proceed.") (citing, *inter alia*, *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.")).

Commission defeats its Equal Protection claim, that failure also defeats its substantive due process claim. *Accord Willis v. Town of Marshall*, 426 F.3d 251, 266 (4th Cir. 2005) ("Because Willis's substantive due process claim thus 'fully overlaps' her Equal Protection claim, the district court properly rejected the due process claim."); *Tounget v. City of Hemet*, 2009 WL 536835, *7 (C.D. Cal. Feb. 24, 2009) ("Plaintiff's selective prosecution [claim, in some respects the criminal equivalent of JDC's substantive DP selective-enforcement claim] appears duplicative of his equal protection claim based on a 'class of one' theory of liability. At this stage . . . , Plaintiff states a claim for the same reasons stated in connection with Plaintiff's equal protection claim.").

**As to the second factor of the test for preliminary injunctive relief,** JDC does *allege* harm that it will suffer, if a PI does not issue, that will not be reparable with an award of monetary damages following a victory on a dispositive motion or at trial. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.") (citing *Basiccomputer Corp. v. Scott*, 973 F.3d 507, 511 (6th Cir. 1992)); *see, e.g., Zazueta v. Ky. Cmty.& Tech. Coll. Sys.*, 92 F. App'x 298 (6th Cir. 2004) (p.c.) (Batchelder, Gibbons, D.J. Cohn) (in professor's employment-discrimination action against college and its officials, district court did not abuse discretion in denying professor's request for preliminary injunction because she had an adequate remedy at law in the form of money damages if she prevailed). Namely, JDC alleges that in the absence of a PI, the Commission will continue to violate its constitutional rights, including its right to equal protection (the right not to have Michigan lottery regulations selectively enforced against it without a rational basis for the difference in treatment), and its liberty interest in freely pursuing any lawful occupation of its choosing and its right to freedom of contract (which JDC

denominates as Substantive Due Process claims, *see* PI at 9. The deprivation of a constitutional right certainly constitutes harm that cannot be adequately remedied with a later payment of money damages. *Cf. Plane v. US*, 750 F. Supp. 1358 (W.D. Mich. 1990) (issuing preliminary injunction against Defense Logistic Agency's random urinalysis drug-testing program of certain civilian employees, where testing infringed on employees' Fourth Amendment rights).

But, as shown during the discussion of the first factor, JDC's constitutional claim lacks merit, so there is no constitutional deprivation to be enjoined in the first place.

**Absent a showing that a PI is needed to stop the violation of JDC's constitutional rights, JDC cannot satisfy the second factor for the issuance of a PI, irreparable harm.** This is true even if JDC were to convince the court that it will lose most or all of its profits if the Commission is not enjoined from denying applications that involve JDC as lessor of premises or supplier of gaming equipment. JDC explains that without a PI, it "will continue to suffer additional losses in the form of loss of rental revenues; loss of existing and potential clients; damage to its honor, good name, and integrity in the community; and significant damage to established business relationships." PI at 10-11. JDC emphasizes that "[time is of the essence for the charities that utilize Millionaire Parties as fund raisers[,] and every week that elapses where JDC is not holding any fund raising event costs the business tens of thousands of dollars in lost revenue." PI at 11. But even temporary unemployment or other *total* loss of income, remediable later by payment of money, is not irreparable harm for this purpose. *See Overstreet*, 305 F.3d at 579 (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury") and *Aluminum Workers Int'l Union, AFL-CIO, Local No. 215 v. Consol. Alum. Corp.*, 696 F.2d 437, 444 (6th Cir. 1982) (finding that employees did not suffer

irreparable harm from unemployment pending arbitration) & *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) ("[t]he loss of a job is quintessentially reparable by money damages")); *Jerome v. Viviano Food Co., Inc.*, 489 F.2d 965 (6th Cir. 1974) (Title VII plaintiff who claimed that defendant refused to hire her because she was a woman was not entitled to a PI, because back wages could adequately compensate her later if she prevailed on her claim).

Even a company's substantial loss of market share or complete dissolution or bankruptcy does not constitute irreparable harm for this purpose, because it too is considered compensable by money damages later. *See Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir. 1991) (not abuse of discretion to deny agricultural cooperative's motion for PI, notwithstanding its allegation that defendants' continued contractual breaches "will lead to a decline in confidence in the cooperative" and, in turn, "difficulty in acquiring milk, loss of customers, and ultimately . .. the dissolution of the cooperative"); *UF&CWU, Local No. 626 v. Kroger Co.*, 778 F.2d 1171 (6th Cir. 1985) (not abuse of discretion to deny union's motion for PI prohibiting sale of stores pending arbitration, because arbitrator could award back-pay and damages if it found that company breached contract, and company would suffer substantial harm if injunction were erroneously granted unless union posted very large bond); *Ebersspraecher North Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp.2d 592 (E.D. Mich. 2008) (maker of auto exhaust products would not suffer irreparable harm if it were required to pay price increases that defendant muffler supplier alleged were due under requirements contract, notwithstanding plaintiff's allegations that it could not obtain mufflers anywhere else, would incur millions of dollars in penalties from auto manufacturer, and would have to close its doors).[29]

---

[29]

In any event, JDC's PI application does not actually allege that it runs a real risk of

The failure to show irreparable harm, by itself, can justify the denial of preliminary injunctive relief without consideration of the other three factors. *See Hacker v. FBOP*, 2006 WL 2559792, *8 (E.D. Mich. Sept. 1, 2006) (Lawson, J.) ("The failure to demonstrate irreparable harm is fatal to the petitioner's request for a preliminary injunction. [T]he Court need not evaluate the other factors.").

**JDC's poor showing on these first two factors (likelihood of success on the merits, and irreparable harm absent a PI) obviates the need to consider the third and fourth factors (harm to others if the preliminary injunction issues, and the public interest).** *See Essroc*, – F. Supp.2d at –, 2008 WL 5505852 at *7 ("In light of Essroc's weak to non-existent showing on the first factor . . . and the second factor . . . – either of which alone justifies denial of the preliminary injunction – the court need not consider the third and fourth factors (harm to others if the preliminary injunction issues, and the public interest).") (citing *Edwards v. Burnett*, 2006 WL 1983236, *2 (E.D. Mich. July 12, 2006) (Borman, J.) ("Given the impossibility of Plaintiff's success on the merits, and the lack

---

dissolution or bankruptcy if the court declines to enjoin the Commission from denying applications on the grounds stated – let alone provide credible evidence of such a risk. *Cf. Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802-03 (3d Cir. 1989) (district court abused discretion in issuing PI requiring defendant to continue contract, as plaintiff failed to present sufficient evidence that termination of contract would force plaintiff to shut down or declare bankruptcy).

*Contrast Pascarell v. NY Shipping Ass'n, Inc.*, 650 F.2d 19 (3d Cir. 1981) (district court properly enjoined implementation of "Rules on Containers" in CBA between union and defendant shipping association pending final NLRB determination of whether rules violated federal law, as charges were not frivolous and implementation of rules could have put freight consolidators out of business before NLRB had time to determine whether rules were illegal);

*B&D Land & Livestock Co. v. Connor*, 534 F. Supp.2d 891 (N.D. Iowa 2008) (producer showed credible threat of irreparable harm if court did not preliminarily enjoin USDA conversion of wetlands, as denial of present benefits or collection of past benefits would force producer into bankruptcy, and money was not adequate remedy for loss of ability to continue farming operations).

of showing of irreparable harm, it is not necessary to discuss the other two factors – substantial harm to others and the public interest.")).

For these reasons, the court will deny JDC's application for a preliminary injunction.[30]

## LEGAL STANDARD:  RULE 12(b)(6)

This court assesses a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted under the same standard as a Rule 12(c) motion for judgment on the pleadings. *Griffin v. Reznick*, 2008 WL 4741738, *2 (W.D. Mich. Oct. 28, 2008) (Maloney, C.J.) (citing *Zeigler v. Mieskiewicz*, 2008 WL 650335, *2 (S.D. Ohio Mar. 5, 2008) (citing *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007))).  Such motions turn on legal issues, not an assessment of the evidence. *Griffin*, 2008 WL 4741738 at *2 (citing *Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 640 n.5 (6th Cir. 2006) (Griffin, J.) ("*Tech Rec*") and *Thomas v. Arn*, 474 U.S. 140, 150 n.8 (1985) ("[M]otions for judgment on the pleadings and dismissal for failure to state a claim on which relief can be granted . . . consist exclusively of issues of law.")).  A Rule 12(c) motion is simply one permissible avenue for contending that the complaint should be dismissed because it fails to state a claim on which relief can be granted.  *See Griffin*, 2008 WL 4741738 at *2 (citing *Arbaugh v.*

---

[30]

Given this disposition, for a ruling on the PI application, the court need not address the Commissioner's alternative arguments:

first, that JDC lacks standing, *see* Commissioner's Opp to PI at 4-7; MTD at 7-13 and JDC's Opp to MTD at 2-4 and Commission's Reply at 3-6;

second, that the State and its officers sued in their official capacity are not "persons" within the meaning of 42 U.S.C. § 1983, *see* Commissioner's Opp to PI at 12 with n.42 and MTD at 18-20;

and third, that all three defendants in their official capacities are entitled to qualified official immunity against the money-damage claims, *see* MTD at 20-22.

*Y&H Corp.*, 546 U.S. 500, 507 (2006) ("a defense of failure to state a claim upon which can be granted . . . may be made in any pleading . . . or by motion for judgment on the pleadings, or at the trial . . . .") (quoting FED. R. CIV. P. 12(h)(6))).

"Such motions 'presume as a legal matter the lack of any need for an evidentiary hearing . . .'" *Griffin*, 2008 WL 4741738 at *3 (citing *US v. Raddatz*, 447 U.S. 667, 693-94 (1980)).  Indeed, the court must accept all of the complaint's factual allegations as true and construe the complaint in the light most favorable to the plaintiff.  *Tech Rec*, 186 F. App'x at 640 n.5 (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005) ("*PONI*")); *see also Bohanan v. Bridgestone/Firestone No. Am. Tire, LLC*, 260 F. App'x 905, 906 (6th Cir. 2008) (citing *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)).  But the court need not draw unwarranted factual inferences or accept the plaintiff's *legal* conclusions. *Bohanan*, 260 F. App'x at 906 (citing *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)).

And each claim's factual allegations must *plausibly* suggest a viable claim; the claim must be plausible and not merely conceivable.  *Griffin*, 2008 WL 4741738 at *3 (citing *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 455 (6th Cir. 2007) (en banc) (Sutton, J., joined by Griffin et al.) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, –, 127 S.Ct. 1955, 1974 (2007))).  "The 'factual allegations must be enough to raise a right to relief above the speculative level'", not merely create a "'*suspicion* of a legally cognizable cause of action . . . .'" *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974) (internal alterations omitted)).[31]  There must be either direct of inferential allegations regarding all the

[31]

Until 2007, our Circuit followed the standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which directed courts to grant a 12(b)(6) motion "when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint."

material elements of each claim. *LULAC v. Bredesen*, 500 F.2d 523, 527 (6th Cir. 2007) (McKeague, J.) (citing *Twombley*, 550 U.S. at –, 127 S.Ct. at 1969).

Our Circuit cautions that district courts should not overstate the hurdle that *Twombley* establishes for plaintiffs to survive a Rule 12(b)(6) or Rule 12(c) motion:

> In *Erickson v. Pardus*, 550 U.S. [89], 127 S.Ct. 2197 . . . (2007) [(p.c.)], decided two weeks after *Twombley*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 2200 (quoting *Twombley*, 127 S.Ct. at 1964). The opinion in *Erickson* reiterated that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id.* (citing *Twombley*, 127 S.Ct. at 1965). We read the *Twombley* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12.

*Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 550 (6th Cir. 2008) (Griffin, J.) (quoting *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008) (footnote omitted)) (other internal quotation marks and alterations omitted). Nonetheless, "[w]hile a complaint need not contain detailed allegations, [it] must include more than mere labels and conclusions." *Petros v. Sampson*, 2009 WL 2761425, *2 (W.D. Mich. Feb. 4, 2009) (Edgar, J.) (citing, *inter alia*,

_____

*Taylor v. Sampson*, 2008 WL 2923435, *2 n.3 (W.D. Mich. July 25, 2008) (Maloney, J.).

In *Twombley* (2007), the Supreme Court "retired the 'no set of facts' formulation of the Rule 12(b)(6) standard and dismissed an antitrust-conspiracy complaint because it did not contain facts sufficient to 'state a claim to relief that is plausible on its face.'" *Griffin*, 2008 WL 4741738 at *3 n.1 (quoting *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 337 n.4 (6th Cir. 2007) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974)). *See also Casden v. Burns*, – F. App'x –, –, 2009 WL 103620, *6 n.5 (6th Cir. Jan. 16, 2009) (C.J. Boggs, Clay, D.J. Bertlesman).

"In some cases, *Twombley* may make it easier . . . to grant 12(b)(6) than the *Conley* standard." *Taylor*, 2008 WL 2923435 at *2 n.3.

*Twombley*, 550 U.S. at –, 127 S.Ct. at 1965).

When considering whether to grant a Rule 12(c) or 12(b)(6) motion, the court primarily considers the complaint's allegations, but may also take into account items appearing in the record and attached exhibits. *Poly-Flex Const., Inc. v. NTH, Ltd.*, 582 F. Supp. 892, 901 (W.D. Mich. 2008) (Maloney, C.J.) (citing *LaFace Records, LLC v. Does 1-5*, 2008 WL 513508, *3 (W.D. Mich. Feb. 22, 2008) (Maloney, J.) (citing *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001))).

**DISCUSSION:   Does JDC State a Claim on Which Relief can be Granted?**

For the reasons explained in the PI discussion, even accepting all of JDC's well-pled allegations, JDC has not stated Equal Protection and Substantive Due Process claims on which relief can be granted.  Dismissal of counts 1 and 3 is warranted under FED. R. CIV. P. 12(b)(6).

**As for count two, violation of procedural due process, the Lottery Commission correctly contends that JDC had no cognizable liberty or property interest in the grant of the Grand Rapids Jaycees' and Band Parents' millionaire-party applications.**  This claim fails because the Jaycees and the Band Parents had no constitutionally cognizable property interest in a license that they did not hold; *a fortiori*, JDC and Jennifer Allen could have no constitutionally cognizable property interest in those third parties' would-be licenses (less still a property interest in any profit they *expected or hoped* to earn doing business with the licensees after their approval). *Accord Durham v. Louisiana State Racing Comm'n*, 458 So.2d 1292, 1295 (La. 1984) ("There was no violation of procedural due process because Mrs. Durham [whose application for a horse-racing license was rejected because of her husband's past violations of horse-racing regulations] had no protected interest in the benefits conferred by a license she did not actually hold.") (citing *Bd. of*

*Regents of State Colleges v. Roth*, 408 U.S. 564 (1972))[32]; *Lewitus v. Colwell*, 479 F. Supp. 439 (D. Md. 1979) ("Mr. Lewitus [whose application was denied because of his association with an unrelated person who had violated horseracing regulations elsewhere] never had a constitutionally protected property interest in a Maryland racehorse owner's license. No state law entitles him to one. He had not 'already acquired' one when the Commission denied his application. At most, the plaintiff had an abstract desire for or unilateral expectation of receiving one.") (citing *Medina v. Rudman*, 545 F.2d 244 (1st Cir. 1976)).[33]

**Moreover, the court determines that, even if JDC / Jennifer Allen had a cognizable property interest in the Band Parents' or Jaycees' licenses – or in the business that would necessarily flow from the grant of those licenses – that interest was afforded adequate**

---

[32]

JDC refers to *Durham* as "an obscure case from Louisiana." JDC Supp Br at 3. While *Durham* is of course only persuasive authority, the court rejects any notion that a published opinion rendered by the *Supreme Court* of a State is "obscure." And calling a persuasive case "obscure" is no substitute for showing that its reasoning is faulty. This JDC has not done.

[33]

*Cf. US v. Fuller*, 409 U.S. 488 (1973) (grazing permit is not a property interest whose taking is compensable under the Takings Clause);

*Ponterio v. Kaye*, – F. App'x –, –, 2009 WL 1024666, *2 (2d Cir. Apr. 16, 2009) (rejecting class-of-one and other constitutional claims) ("[S]tate judges have neither a property interest nor a liberty interest in a discretionary reappointment to the bench, and reappointment is therefore not governed by the procedural due process protections of the Fourteenth Amendment.");

*Stevens Co. v. USDOI*, 507 F. Supp.2d 1127 (E.D. Wash. 2007) (no property interest in a grazing permit);

*Conti v. US*, 291 F.3d 1334, 1341-42 (Fed. Cir. 2002) (no compensable interest in a government-issued fishing license);

*Patel v. City of Sauk Center, Minnesota*, 2007 WL 2287874, *6-7 (D. Minn. Aug. 3, 2007) (unsuccessful applicant for liquor license had no procedural or "substantive" due-process claims, because Minnesota law did not confer any "right" to such a license).

**procedural safeguards under the circumstances:** lottery officials met with Jennifer Allen in May 2008 informally, as permitted by Mich. Admin. R. 432.21107. JDC has identified no binding authority holding that she was entitled to more procedural safeguards with regard to a state agency's denial of *other entities'* gaming applications. If an entity comes to believe that a state agency is denying its actual and potential business partners' applications out of a malicious desire to harm the entity, the entity can sue after-the-fact and assert a "class of one" Equal Protection claim as JDC did here. But that does not mean that every potentially affected entity is constitutionally entitled to procedural safeguards *before* another, legally independent entity's application for a license, permit or variance is denied.

Moreover, defendant Petersen advised Mike Allen, at their February 26, 2008 meeting, that surrendering All-In's supplier license and becoming a location lessor meant giving up procedural due-process rights:[34]

> MR. ALLEN:    We're already paying the price. I mean, I surrendered our license. I would like to keep the license. But honestly, we would take it the next step further. If you're not going to allow us to be, you know, involved in charitable gaming at all, I – we would want to go the administrative hearing, because I didn't – when I surrendered my license I'm thinking, well, I don't know that U want to be a supplier anyways because of the changes that have been made. I mean, that truly was part of my thinking process. I told Shannon, I said, why do we want to continue paying an attorney, and our energy and stuff fighting this when the direction is clearly not to be a supplier here.

> MR. PETERSEN:    Well suppliers have got more rights, under a license, than locations. Locations have got no rights and no standing at all.

> MR. ALLEN  :    Right.

---

[34] The court intimates no opinion as to whether federal or state law required the Commission to so advise Mike, whether before he decided to surrender All-In's supplier license or afterwards.

MR. PETERSEN:    I mean, we've found that out, we've been sued and we've gone through the trouble. That's why you want to keep your supplier license, because under a supplier license, we can't just yank it. I mean, we have to go through that process.

MR. ALLEN:       Right.

MR. PETERSEN:    Location, I mean, we turn off the spicket [sic, spigot] tomorrow and, they're done. They don't have no hearing [sic]. They don't have any – we don't have to send out a letter, nothing. I mean, we have total control over that so that's why a supplier license has some advantages to it.

All-In Tr. 18:4 to 19:9.

Finally, the court notes that state and local government agencies, as well as courts, could readily become overwhelmed by the burden of formal notice and hearing procedures for persons and companies whose livelihood would be adversely affected by the agency's denial of a potential business partner's license. JDC has not pointed to any Supreme Court or Sixth Circuit Court of Appeals authority that required the lottery to offer *JDC any* procedural safeguards regarding applications to which it was not a signatory – let alone more or better safeguards than it received – however much the denial of those applications may have led, in turn, to JDC losing business or business opportunities. Counts two and three, the procedural due process and "substantive due process" claims, must be dismissed for failure to state a claim as well.[35]

---

[35]

Because JDC has failed to state an equal-protection, procedural due process, or substantive due-process claim, the court need not consider the defendants' alternative argument based on sovereign immunity. *Cf. Taylor Acquisitions, LLC v. City of Taylor*, 313 F. App'x 826, 838 n.10 (6th Cir. 2009) (McKeague, Griffin, S.D. Ohio D.J. Weber) ("Because Plaintiff cannot establish an Equal Protection violation, we need not address whether Defendants were entitled to summary judgment on the basis of qualified immunity.") (citing *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008) and *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

*Accord Ponterio v. Kaye*, 2009 WL 1024666, *2, – F. App'x –, – (2d Cir. 2009) ("Having concluded that Ponterio has failed to state claims for . . . [class of one] denial of equal protection of

<u>Standing and Sovereign Immunity Issues Mooted</u>

This disposition moots the Commission's alternative motion to dismiss under FED. R. CIV. P. 12(b)(1) for lack of standing, and its alternative contention that sovereign immunity bars some or all of JDC's claims or prayer for relief. Accordingly, those portions of the Commission's motion to dismiss will be denied without prejudice. *See J&R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384, 390 (6ᵗʰ Cir. 2008) ("Because . . . plaintiffs' claims are meritless, we need not address whether they would have had standing to represent the purported class."); *EBI-Detroit, Inc. v. City of Detroit*, 279 F. App'x 340, 349 (6ᵗʰ Cir. 2008) (<u>C.J. Boggs</u>, Rogers, D.J. Shadur) ("But we need not definitely answer the standing question now, because even if EBI has standing, its claims fail."); *Alpha Telecomms., Inc. v. IBM Corp.*, 241 F. App'x 301, 305 (6ᵗʰ Cir. 2007) (Martin, Daughtrey, <u>N.D. Cal. D.J. Wm. Schwarzer</u>).[36]


**<u>ORDER</u>**

The plaintiff's application for a preliminary injunction **[document # 7] is DENIED**.

---

the law, we need not consider whether defendants are entitled to qualified immunity from this action."); *Vorum v. Canton Twp.*, 2007 WL 2317517, *1 (W.D. Pa. Aug. 7, 2007) (granting defendant local government's motion for SJ on claim that its denial of zoning approval for horseracing operation caused State's denial of license of horseracing and pari-mutuel betting license and thereby violated Equal Protection, Substantive Due Process, and Procedural Due Process) ("Because the court concludes that Defendants are entitled to summary judgment on the substantive merits, it need not address qualified immunity."), *aff'd o.g.*, 308 F. App'x 651 (3d Cir. 2009).

[36]

    *Cf. Taylor v. Michigan Dep't of Nat. Resources*, 502 F.3d 452, 458 (6ᵗʰ Cir. 2007) ("We need not address whether or not plaintiff would have had standing to request an injunction because . . . there was no constitutional violation . . . ."), *cert. denied*, – U.S. –, 128 S.Ct. 1256 (2008). Conversely, a court may avoid consideration of the merits and consider only the standing issue if it concludes that the plaintiff lacks standing. *See, e.g., Welch v. Taylor*, 2009 WL 2009 WL 1885039 (W.D. Mich. June 30, 2009) (Maloney, C.J.).

Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted **[document # 15] is GRANTED.**

Defendants' Rule 12(b)(1) motion to dismiss for lack of standing, sovereign immunity, and/or qualified immunity [also #15] is **DENIED without prejudice as MOOT**.

To the extent that the plaintiff intended to raise claims under state law, the court declines supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c).[37]

All claims arising under federal law are **DISMISSED**.

Any claims arising under state law are **DISMISSED without prejudice**.

This case is **TERMINATED** and **CLOSED**.

This is a final and appealable order.[38] [39]

---

[37]

*See, e.g., Griffith v. Girdler*, 2009 WL 961200 (E.D. Ky. Apr. 8, 2009) (Reeves, J.) (after granting motion to dismiss class-of-one equal protection claim and substantive due process claim, court declined supplemental jurisdiction over claim under Kentucky statute).

[38]

The denial of the PI alone is not final or otherwise immediately appealable. *See Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp.2d 962, 971 (W.D. Mich. 2008) (Maloney, C.J.) ("'It is well settled that an order granting, denying, or dissolving a [TRO] is generally not appealable.'") (quoting *Workman v. Bredesen*, 486 F.3d 896, 922 (6th Cir.) (Sutton, J.) (quoting MOORE'S FED. PRAC. § 65.41 (3d ed. 2005))) (alterations omitted), *cert. denied*, – U.S. –, 127 S.Ct. 2160 (2007), *pet. cert. filed o.g.* (U.S. May 8, 2007) (No. 06-11103). Dismissal of an entire complaint, however, is a final, appealable order, *Morris v. Marsh & McClennan, Inc.*, 439 F.3d 295, 299 (6th Cir. 2006) ("[T]he . . . order granting the Defendants' motion to dismiss is an appealable final decision."), so JDC may appeal the denial of the PI together with an appeal of the dismissal of the complaint.

[39]

Our Circuit reviews *de novo* the dismissal of a complaint for failure to state a claim on which relief can be granted. *See Glass v. Kellogg Co. Bakery, Confectionery, Tobacco Workers, and Millers Pension Plan*, 2008 WL 4534422, *5 n.3 (W.D. Mich. Oct. 6, 2008) (Maloney, C.J.) (citing *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (Griffin, J.) (cite omitted)).

The Circuit reviews a decision regarding supplemental jurisdiction for clear error; reversing only if the court relied on clearly erroneous findings of fact, improperly applied the law, or used the wrong legal standard. *See Bell-Coker v. City of Lansing*, 2009 WL 166556, *8 (W.D. Mich. Jan.

**IT IS SO ORDERED this  24th  day of July 2009.**

                                           /s/ Paul L. Maloney
                                           Honorable Paul L. Maloney
                                           Chief United States District Judge

---

21, 2009) (Maloney, C.J.) (citing, *inter alia*, *US v. Chambers*, 441 F.3d 438, 446 (6th Cir. 2008)).